Jack Wade CLARK, Appellant,

v.

The STATE of Texas, Appellee.

No. 71251.

Court of Criminal Appeals of Texas,
En Banc.

March 9, 1994.

Rehearing Denied June 22, 1994.

Travis S. Ware, Dist. Atty. & Michael West, Asst. Dist. Atty., Lubbock, Robert Huttash, State's Atty., Austin, for the State.

Gary A. Taylor, Austin, David R. Dow, Houston, David L. Botsford, Austin, Gerald H. Goldstein, San Antonio, Roderique S. Hobson, Jr., Lubbock, for appellant.

Amicus brief filed for appellant by Carlton McLarty, Ralph H. Brock, Joe A. Adamcik, Lubbock.

*OPINION*

OVERSTREET, Judge.

In February of 1991, appellant was convicted, in the 364th District Court of Lubbock County, Texas, of capital murder pursuant to V.T.C.A. Penal Code § 19.03(a)(2), specifically murder during the course of committing and attempting to commit aggravated sexual assault. The indictment alleged that the offense occurred on or about the 16th day of October 1989. After the jury returned affirmative answers to the special issues submitted pursuant to Article 37.071 subd. 2(b)(1)(2), V.A.C.C.P., the trial court assessed punishment at death. On direct appeal, appellant raises sixty-two points of error.

## I. SUMMARY OF PERTINENT FACTS

Appellant's written confession was admitted into evidence. It described how he had, during the early morning hours, observed the decedent at a pay phone, stabbed her in the shoulder, forced her into her own car and driven away, sexually assaulted her, and then stabbed her in the heart. The pathologist's testimony confirmed the two stab wounds and injuries indicating sexual assault.

## II. JURY SELECTION

### A. Duty to Follow Instructions and § 12.31(b) Oath

Points of error five through twenty-seven allege that the prosecutor misled veniremembers about their duties under the trial court's jury charge by telling them that they would violate TEX.PENAL CODE ANN. § 12.31(b) (Vernon 1974), if they gave false answers to the special issues to avoid the death penalty.[1] The relevant language in § 12.31(b) is that a juror state that the mandatory penalty of death or life imprisonment will not affect his deliberations. Appellant is

---

1. At the time of trial, § 12.31(b) read:
 Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or impris-

 onment for life will not affect his deliberations on any issue of fact.
 That section was amended, effective September 1, 1991, such that the second sentence was deleted and replaced with language not relating to a prospective juror's oath or disqualification.

not complaining about veniremembers not complying with § 12.31(b) or being improperly excused because of such, but rather that the prosecutor's questioning contaminated the veniremembers as in *Morrow v. State,* 753 S.W.2d 372 (Tex.Cr.App.1988) (which involved an erroneous hypothetical attempting to explain the difference between "intentional" and "deliberate"), and hindered him in the exercise of his challenges. He suggests that the veniremembers were in effect told that it was improper for them to make an individualized determination of the appropriate punishment because the prosecutor told them that their oath prohibited any consideration of the sentence that appellant deserved.

■■ We disagree. § 12.31(b) was not facially unconstitutional, but rather its broad application in excluding veniremembers from the jury because of feelings about the death penalty was held unconstitutional. *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Penry v. State,* 691 S.W.2d 636, 656 (Tex.Cr.App.1985), *cert. denied,* 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986); *White v. State,* 610 S.W.2d 504, 508 (Tex.Cr.App.1981). As noted above, appellant is not claiming any veniremembers were improperly excused because of § 12.31(b). § 12.31(b) simply directs that jurors deliberate on issues of fact without being affected by the mandatory penalty of death or life imprisonment. Deliberating issues of fact at punishment involve answering the special issues in light of the evidence. If all of the evidence can be fully considered and acted upon via the special issues, there is no unconstitutional impo-

sition of a death sentence. *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988). If there is mitigating evidence which is outside the scope of the special issues, then some additional method must be included to allow the jury to consider and give effect to that evidence also. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Thus the prosecutor's questioning, in-and-of-itself, did not mislead or contaminate the veniremembers about their consideration and application of the evidence. The jury was still required to answer the special issues in light of the evidence, and if there was evidence outside the scope of the special issues, the trial court was required to provide a method for considering and applying that evidence.[2] The prosecutor's questioning did not abrogate the requirement for such consideration and application of the evidence. Accordingly, points five through twenty-seven are overruled.[3]

■ Points of error number twenty-eight through forty claim that by administering, over objection, the § 12.31(b) oath to each juror the trial court "erroneously misled the entire jury about its duty to follow the *Penry* instruction which required false answers to the special issues to avoid the death penalty[.]"[4] He insists that the oath minimizes the jury's duty to make an individualized determination of the appropriate punishment and precludes the jury from giving effect to mitigating evidence with relevance beyond its tendency to disprove the special issues. He adds that this resulted in a tribunal organized to return a verdict of death.

**2.** The trial court did include an additional instruction in the punishment jury charge about considering and applying any mitigating circumstances raised by the evidence. *See* discussion of point of error number fifty-four, *infra.*

**3.** We also note that there is a potential preservation of error problem for appellant. He did object, unsuccessfully, when the prosecutor began questioning each veniremember-in-question about § 12.31(b). However, at the conclusion of the questioning of each (except for the subject of point number twenty-seven), he did not make any objection that the prosecutor's questioning had misled any of the veniremembers or that they had been contaminated thereby, nor did he seek to make a challenge for cause on that basis, i.e.

they were either accepted as jurors or appellant exercised peremptory challenges thereon. (Appellant did object to the last one, who was the subject of point of error twenty-seven, noting that he had exhausted his peremptory challenges and unsuccessfully sought an additional one and the prosecutor's repeated questioning. He added that he was objecting and challenging the entire panel for cause, which the trial court denied. That veniremember was thus seated as the twelfth juror.)

**4.** Points twenty-eight through thirty-nine go to the administration of the oath to each of the jurors individually during the course of the voir dire process, while point forty goes attacks the administration of the oath to the jury as a group.

As noted above, § 12.31(b) was not facially unconstitutional. As this Court discussed in *Granviel v. State*, 723 S.W.2d 141, 155 (Tex. Cr.App.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987), "the oath does not prohibit jurors from considering all mitigating factors in arriving at answers to the special issues at the punishment phase." We also find no conflict between the oath and the so-called *Penry* instruction which the trial court included in the punishment jury charge.[5] The jury was not instructed to give "false" answers to the special issues, but rather to answer them "no" in response to mitigating evidence. The trial court did not err in administering the § 12.31(b) oath. Points twenty-eight through forty are therefore overruled.

### B. Denying Questioning

Points number forty-one through fifty claim that appellant was denied the opportunity to question 10 veniremembers about the definition of "deliberately" that the trial court decided to include in the jury charge after it had ordered his attorney and the prosecutor to tell them that the term might not be defined. The trial court displayed some ambivalence about whether it was or was not intending to include a definition of "deliberately" in the punishment jury charge. However, it is very well-settled that there is no requirement that any such definition be included. *Lewis v. State*, 815 S.W.2d 560, 563 (Tex.Cr.App.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1296, 117 L.Ed.2d 519 (1992). And in the instant cause, the trial court did indeed include such a definition.

■ The gist of appellant's complaint is that because he was not sure of the particulars of any definition that would be given, he was unable to properly question the ten veniremembers-in-question. However, there is no requirement that the trial court during jury selection voir dire formulate or specify definitions to be included in the jury charge. In fact, Articles 36.14, 36.15 and 36.16, V.A.C.C.P., contemplate development and submission of the jury charge after the close of evidence and before jury argument begins. Our review of the record does not reveal that

appellant was denied the opportunity to question any of the ten veniremembers-in-question about the concept of "deliberately." We therefore overrule points forty-one through fifty.

### C. Other Points Regarding Voir Dire

■ Point fifty-three claims that the trial court denied appellant the opportunity to make intelligent use of his challenges against 15 veniremembers who were accepted or struck by the defense after the trial court "ordered counsel to question them about an instruction about the burden of proving mitigating circumstances" where such instruction was materially different from the one included in the jury charge. The gist of appellant's complaint is that the trial court did not disclose to him the precise particulars of an instruction on mitigating evidence that would be included in the punishment jury charge. However, as noted above, there is no requirement that the trial court during jury selection voir dire formulate or specify an instruction to be included in the jury charge. Also, there is no showing that the trial court "ordered" appellant to question veniremembers in a particular manner about mitigating circumstances, but rather indicated that it tried to give both parties some guidelines on what it anticipated the charge would be; however, it refused "to get locked down" as there was no charge at that time. The trial court did say that there definitely would not be an extra special issue on mitigation. Point of error fifty-three is therefore overruled.

Point fifty-one avers error in the trial court granting a State's challenge to Veniremember Patrick on a ground that was not listed in Article 35.16, V.A.C.C.P. Point fifty-two claims that the trial court erred in denying appellant's motion for mistrial when Dr. Patrick was retroactively removed for cause after having been accepted as a juror.

■ Dr. Patrick was initially questioned and accepted as a juror by both parties. During questioning, she had expressed concerns about her job as a pediatrician treating indigent children at a local health clinic possibly being affected by her jury service. She

---

**5.** *See* discussion of point of error number fifty- four, *infra*.

had indicated that the clinic's administrator would have the responsibility of finding a replacement for her, and that it would be difficult but probably manageable. Several days later, after several more veniremembers had been questioned and four had been accepted and sworn, Veniremember Patrick reappeared before the court. The trial court indicated that she had made several phone calls to the clerk's office. Dr. Patrick then explained that the nurse practitioner at the clinic had recently been hospitalized and would not be back to work for a month or perhaps several months, thus leaving Dr. Patrick as the sole provider for the indigent children that come to the clinic. She also stated that since her initial voir dire questioning, she had found out that the executive director would not be able to find someone to replace her at the clinic for the duration of a trial, thus the 250–300 children seen per week would probably end up in the county emergency room. Upon further questioning, Veniremember Patrick indicated that she felt that she would be incapable or unfit to serve as a juror because her attention would not be focused on the case and that her mind would probably wander and she would be distracted. She stated that she "would not be able to be fair because [she] would be distracted and worried about other things." She also indicated that she had three children at home, two-year old triplets. She later added that "[her] abilities would be impaired" when asked if her preoccupation to her job would substantially impair her duties as a juror. She also said that she "would not be able to keep th[e] oath because of being distracted and not being able to concentrate on the evidence that was being presented." The State's challenge for cause, over appellant's objection, was then sustained. Appellant's request for a mistrial was denied. The trial court did then grant appellant an additional peremptory challenge as requested. Appellant had previously objected to the whole procedure involving further questioning and to any challenges, peremptory or for cause, being made.

In *Draughon v. State*, 831 S.W.2d 331, 335 (Tex.Cr.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 3045, 125 L.Ed.2d 730 (1993), in a very similar situation we held that where the entire jury has not yet been selected and no evidence received, the trial court is permitted to allow further examination and to entertain additional challenges when it comes to its attention that a previously selected juror may be objectionable/excusable/disqualified from service. Likewise, in the instant cause, we find no error in the trial court's actions in allowing such further examination and challenge. Thus there was no error in overruling appellant's motion for mistrial based upon such procedures.[6] Point fifty-two is therefore overruled.

We note that while the trial court sustained the State's challenge for cause, there was no mention by anyone of Article 35.16; i.e. not by the State in making the challenge, appellant in objecting thereto, nor the trial court in sustaining it. In *Butler v. State*, 830 S.W.2d 125 (Tex.Cr.App.1992) we held that the trial court had the discretion, upon a reason sufficient to satisfy the court, to excuse a veniremember per Article 35.03, V.A.C.C.P., even after the period of questioning of the entire venire. Such was to provide the most efficient jury empanelment system possible so that the trial court would have the ability to render an excuse to rectify problems created by changed circumstances. *Id.* at 130. We stated that "the power to grant an excusal from jury service (pursuant to Article 35.03) inheres to the trial judge from the first assemblage of the array until the juror is, at last, seated." *Id.* at 131. In *Kemp v. State*, 846 S.W.2d 289, 295, n. 4 (Tex.Cr.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993), we noted that in a situation similar to the case-at-bar, the trial court did not err in excusing a juror after he had been sworn because the trial court has the authority to excuse, for a proper basis, a veniremember already sworn at any point up to the time

---

6. Appellant claims that he "suffered a 'specially unfair disadvantage' " because his jury selection strategy hinged on that veniremember, i.e. he based decisions in his acceptance or rejection of other veniremembers based upon his belief that she was going to be on the jury. As in *Draughon, supra,* we perceive no error under these circumstances.

that the jury has been sworn as a whole and impaneled.

In *Narvaiz v. State,* 840 S.W.2d 415, 426 (Tex.Cr.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993), we concluded that since the trial court had authority to excuse a veniremember under Article 35.03, it was of no consequence if the trial court thought it was acting under the authority of Article 35.16, and that since its decision was reasonable under the circumstances, there was no abuse of discretion; thus there was no need to consider that defendant's claim that there was error in granting the State's challenge for cause to that veniremember under Article 35.16. As in *Narvaiz,* we conclude that under the circumstances in the instant cause there was no abuse of discretion in the trial court excusing Veniremember Patrick; thus, as in *Narvaiz,* we need not consider whether she was challengeable for cause under Article 35.16.[7] Point fifty-one is therefore overruled.

▆ Point fifty-seven alleges that the trial court erroneously denied appellant's challenge for cause against Veniremember Williams after the prosecutor asked her to make a commitment about the psychiatric testimony that he intended to present at punishment. The record reflects that during questioning of Williams, she was informed that the State intended to present psychiatric or psychological expert testimony. The State informed her that that expert would base his opinion not on an examination but upon background and facts that the jury would have already heard. The prosecutor then illustrated using a hypothetical involving shooting the cash register operator during the robbery of a bar, and in which that defendant shot at animals and threatened people. Appellant did not immediately object to that questioning, but rather interrupt-

ed only after other questions had been asked. He eventually challenged her for cause based upon the prosecutor's questioning. In their discussions, appellant acknowledged that he had not objected to the questioning because it was too late. The State's brief asserts that the failure to so object to the questioning failed to preserve the claim of error. However, we find that appellant's claim goes to the denial of the challenge for cause rather than the propriety of the prosecutor's questioning, and therefore conclude appellant's claim that the trial court overruled his challenge for cause has been preserved.

▆ The questioning does not indicate that the prosecutor was "ask[ing] [Veniremember Williams] to make a commitment about the psychiatric testimony that he intended to present" at punishment. The questioning appears to have been illustrative in seeking to determine if Williams generally could accept such expert testimony in answering the special issues. In fact, during this questioning, the prosecutor asked, "Now, do you see anything irritating or distasteful about a psychiatrist or a psychologist answering questions based on that hypothetical situation?" He further asked her if she would "listen to that kind of evidence and judge it like [she] would anything else?" During the course of the questioning, he never asked the veniremember what her vote on the special issues would be in the face of the hypothetical. In *Cuevas v. State,* 742 S.W.2d 331, 336, n. 6 (Tex.Cr.App.1987), *cert. denied,* 485 U.S. 1015, 108 S.Ct. 1488, 99 L.Ed.2d 716 (1988), this Court said that "[i]t is proper to use hypothetical fact situations to *explain* the application of the law." [Emphasis in original.] As that is what it appears that the prosecutor was doing in the instant cause, we see *no error in overruling*

---

7. We also note that there is a potential preservation of error problem for appellant. We observe that the focus of appellant's objection at trial was upon the very procedures allowing further questioning and subsequent challenging of Veniremember Patrick after she had already been accepted. At no time did appellant mention Article 35.16 or make any complaint about whether there was a statutory basis for the State's challenge. Prior to the State questioning Dr. Patrick and before the challenge was made, appellant in

objecting made mention of his anticipation of what the veniremember's responses would be and that the State would then challenge for cause, "and a challenge for cause would probably be sustained." However, he did not question the merits of such a challenge, but still focused upon the propriety of the procedure. Nevertheless, as appellant did object, and in the interests of justice in a death penalty case, we have addressed the merits of appellant's point of error.

appellant's challenge for cause. Accordingly, point fifty-seven is overruled.

In point of error fifty-five, appellant complains about the trial court overruling his objection to the prosecutor telling Veniremember Williams "that the second special issue asked whether there was 'sufficient evidence that society should not take another chance.'" The record reflects that the prosecutor asked Williams:

QUESTION: You get the picture? Just about anything could be violent again. It doesn't have to be just a murder or a capital murder. Are you clear?

ANSWER: Okay. Uh-huh.

QUESTION: That would—Criminal acts of violence that would constitute a continuing threat to society. Well, what do we mean by society? Society is all of us, isn't it?

ANSWER: Yes.

QUESTION: Whether we are out as free people in society, out meaning out of the penitentiary, out of jail out, out of confinement, or we are behind bars as free people—as people who are not free, we're all part of the same society, aren't we?

ANSWER: Yes.

QUESTION: And the people behind bars, would you agree that they are entitled to just as much protection from one amongst them who might threaten their life or cause them physical assault or injury as those of us who are entitled to out in the free world?

ANSWER: Yes.

QUESTION: Sure. And that's the way the law sees it, too. The—Whether there's a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society means—society means wherever the defendant might ultimately end up, whether it's behind bars on a life sentence or some day out in free society. Do you follow me?

ANSWER: Yes.

QUESTION: Is society safe. The question ultimately is does the jury feel that there's sufficient evidence that society should not take another chance. Do you follow me?

ANSWER: Yes.

QUESTION: Okay.

Appellant then objected to the statement as being "not what the law is." The trial court overruled the objection. The prosecutor then went into other matters.

█ Appellant, citing language in *Ellason v. State*, 815 S.W.2d 656, 659 (Tex.Cr.App. 1991), notes that "[p]roof of more than a bare chance of future violence is required to support an affirmative finding to the second [special] issue." However, the questioning by the prosecutor was not in contravention of that principle. As noted above, the prosecutor was talking about "[c]riminal acts of violence that would constitute a continuing threat to society" which is the subject of the second special issue.[8] Whether "society should not take another chance" is an interpretation of the question asked by the second special issue which does not lessen the standard by which it is answered. We perceive no misstatement of the second special issue in the above-noted discussions, as the prosecutor was simply discussing a possible interpretation of the second special issue. Point of error number fifty-five is overruled.

█ Appellant claims, in point fifty-six, that the trial court erred in overruling his objection to the prosecutor telling a veniremember "that the victim would have testified that she was raped, if she was alive." The record reflects that the prosecutor asked that veniremember:

QUESTION: Then you've got to decide which witness you believe more. We've got psychiatrists saying this, and they've got a psychiatrist or a psychologist, maybe a PhD, saying the opposite. Who do you believe more? Who is the better qualified? Do you see what I mean?

ANSWER: Yes.

QUESTION: That's the same as any case. That's how cases are. They're swearing

---

8. At the time the instant offense was tried, Article 37.071(b)(2), V.A.C.C.P., provided that the second special issue asked "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[?]"

matches to a point. Now, do you understand that if we have a capital murder case where a rape has occurred, typically we don't have witnesses, eyewitnesses? Did you know that?

ANSWER: Yes.

QUESTION: Sure. Common sense tells you that, but you don't do that in front of somebody else typically. Do you see what I mean?

ANSWER: Yes.

QUESTION: Now, we had a eyewitness once, but she's dead, [the decedent], if she were living, would testify about a rape. Do you follow me?

ANSWER: Yes.

QUESTION: But she can't because she's dead.

Appellant then "object[ed] to that as being jury argument and outside the proper scope of voir dire." The trial court overruled the objection. The prosecutor then talked about how he got to call witnesses to show various things.

The above-quoted colloquy indicates that the prosecutor, though perhaps somewhat unartfully, was seeking to elicit the views of the veniremember about deciding a case without eyewitness testimony. A veniremember may be subject to a challenge for cause based upon such views. *White v. State*, 779 S.W.2d 809, 820–822 (Tex.Cr.App. 1989), *cert. denied*, 495 U.S. 962, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990). We see no error in overruling appellant's objection to that questioning. Accordingly, point fifty-six is overruled.

Points three and four claim that the prosecutor violated Article 37.071(g), V.A.C.C.P., when he informed two veniremembers, over objection, that a life sentence would be imposed if one juror answered a special issue "no." Article 37.071(g), the statute applicable at the time of trial whose language has since been moved to Article 37.071 § 2(a), provides that veniremembers not be informed "of the effect of failure of the jury to agree on an issue submitted under th[e] article."

The record reflects the following colloquy during the questioning of the veniremember who is the subject of point number three:

PROSECUTOR: If the jury answers affirmatively to both of these questions—You know what affirmative means?

VENIREMEMBER: Yes.

PROSECUTOR: You just said it. Yes and yes, then it is the death sentence if all 12 jurors answer affirmatively.

VENIREMEMBER: Okay.

PROSECUTOR: The same is true if three questions appear. ... Do you follow me?

VENIREMEMBER: Yes, sir.

PROSECUTOR: Again, remember, please, that it takes 12 jurors answering affirmatively to both questions for the death penalty to result, and that would be by order or the Court. The negative of that is that if one juror answers no, then the situation is that the life sentence results.

Appellant then objected to the prosecutor "telling the juror that last statement, that a no answer means a life sentence on the grounds that it violates the statute." When asked which statute, he responded, "The statute with regard to telling them the effect of their answers." The trial court overruled the objection.

The record reflects the following colloquy during the questioning of the veniremember who is the subject of point number four:

PROSECUTOR: If all 12 jurors answer yes to the first question and all 12 jurors answer yes to the second question, it's a death sentence by order of the Court. That's how it happens. Do you understand?

VENIREMEMBER: Yes.

PROSECUTOR: So you don't get to check the box, but it is extremely important to understand that your answers bear directly upon what the sentence will be. Okay.

VENIREMEMBER: Yes, sir.

PROSECUTOR: Even one no answer could result in a life sentence.

Appellant "renew[ed] [his] objection to the effect of informing the prospective juror of

one no answer to an issue." The trial court again overruled the objection.

■ Our reading of the above-quoted colloquies leads us to the inescapable conclusion that the prosecutor did indeed inform the two veniremembers that a "no" vote by a single juror would or could result in a life sentence. We conclude that such information, in the context of the additional questioning about all 12 jurors answering "yes," effectively informed them of the effect of the failure of the jury to agree to any of the special issues, i.e. if even one of the twelve jurors voted "no." Such was in contravention of Article 37.071(g). Thus the trial court erred in overruling appellant's objections at trial.[9] Finding error, we must address harm.

Tex.R.App.Pro. 81(b)(2) provides that "if the appellate record ... reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment." As the error only involved information relevant to punishment, we easily conclude beyond a reasonable doubt that it did not contribute to the conviction.

In *Sattiewhite v. State,* 786 S.W.2d 271 (Tex.Cr.App.1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 226, 112 L.Ed.2d 181 (1990), this Court likewise found error in violation of Article 37.071(g) and discussed the method of assessing harm pursuant to Rule 81(b)(2). It noted that after the entire venire panel was provided information in violation of Article 37.071(g), no further mention was made of such. *Id.* at 278. Also any misstatement was sufficiently attenuated by the trial court's jury charge at punishment, which included instructions informing the jury that if the vote was not unanimously for "yes" or at least 10 for "no" then there shall be no answer for that special issue. *Id.* This Court additionally noted that the jury did not exhibit any confusion in reaching a unanimous verdict, nor was there any correspon-

dence between the jury and the trial court during punishment deliberations. *Id.* at 279.

In the instant cause, the punishment jury charge contained instructions similar to those in *Sattiewhite, supra,* including explanations: that before any special issue may be answered "yes" all jurors must be convinced and the jury must unanimously determine that the State has proven the issue beyond a reasonable doubt; that if any juror had a reasonable doubt as to the propriety of a "yes" answer to the special issues, then that juror should vote "no," that if 10 or more jurors voted "no" as to any special issue, then the answer of the jury shall be "no;" and that if the answer to any special issue is not unanimously "yes" or at least "10" in favor of "no," then there shall be no answer for that special issue. As in *Sattiewhite, supra* at 278, we must assume that the jury conducted itself as directed by the trial court. The record reflects that the sole note from the jury at punishment was a request for a copy of appellant's confession. As in *Sattiewhite, supra* at 279, the jury did not exhibit any confusion in reaching a unanimous verdict. Additionally, our review of the entire voir dire questioning of both of the veniremembers-in-question does not reveal any other mention of the consequences of even a single juror voting "no" to any of the special issues.

In light of *Sattiewhite* and the above discussed observations based upon the record, we conclude beyond a reasonable doubt that the error did not contribute to the punishment. *Id.* at 279. Accordingly, points three and four are overruled.

### III. PUNISHMENT

#### A. Expert Testimony

##### i. Challenges to Dr. Grigson

Point of error number one states, "The court erroneously refused to allow counsel to confront Dr. Grigson with a prosecutor's report in his own files about six capital murder-

---

9. The State claims, among other things, that appellant failed to preserve error in not specifically citing Article 37.071(g) in his objection at trial. However, the objection was quite specific in denoting the merits of his complaint, i.e. that the

State was informing veniremembers of particular information which it was statutorily prohibited from so informing. Such preserved his claim for review.

ers who became model prisoners after he testified that they would kill again." The record reflects that appellant questioned the witness, Dr. James Grigson, outside the presence of the jury about a letter and accompanying report purportedly from the first assistant district attorney of Dallas County. The State agreed that the report and letter were "written to Dr. Jim Grigson from [the named first assistant] of the Dallas District Attorneys office...." The letter and report indicate that the eleven named individuals had had death sentences which had been commuted or reduced. The letter stated that the report had been made by a special investigator. Dr. Grigson indicated that the named investigator worked in the Dallas County District Attorney's Office. The report included a very short description of each of the individual's purported behavior while in prison and one who was on parole. Dr. Grigson admitted that in several of those individual's cases he had testified that they would be a threat wherever they were, including the prison environment, and would kill again.

On appeal, appellant's brief indicates that he sought to impeach Dr. Grigson with the letter and report to show that some of his prior future dangerousness predictions had turned out to be incorrect. He insists that "[t]he evidence of [Dr.] Grigson's past mistakes was clearly relevant to the accuracy of his prediction of future dangerousness in this case." He adds that the report "was much more probative of [Dr.] Grigson's inability to predict future dangerousness than any other evidence that counsel could have used to establish that fact." However, the record reveals that it appears to have been somewhat ambiguous as to whether at trial appellant was seeking to impeach him in this way or in a different manner.

At trial appellant indicated that he wanted to use transcripts from Dallas County trials to impeach statements that Dr. Grigson had made in Lubbock County, i.e. that he "intend[ed] to use these transcripts to impeach statements that he's made in Lubbock County based upon some information we discovered pursuant to [the trial court] allowing us to go through his files." The State objected to such as impeachment on a collateral matter

and going into collateral matters pertaining to other cases. It also objected that such would open up "cans of worms" with respect to the factual issues in those previous trials. One of appellant's attorneys then responded that it was his understanding that Dr. Grigson had consistently testified that the only study that he was aware of that was conducted on his predictions was by a Judge Zimmerman of Dallas County, and that he had perjured himself because he was aware of other studies where his prediction of future dangerousness had not come true. He noted that they had received information of the other study from Dr. Grigson's files. Upon further questioning from the trial court, the attorney indicated that they were entitled to go into such evidence because he was testifying as an expert and they were "entitled to go into what he bases his expertise on." He also said:

> We're entitled to go into—he testifies from his vast experience is how he's able to make these predictions. We're entitled to go into that vast experience and challenge it, you know. He indicates in his prior testimony, and leaves the impression with the jury, that there are no studies [sic] have ever shown that he was wrong, that he's been right every time. I think we're entitled to show that we do have a study to show that he's been wrong, that he's made mistakes, and that goes to his qualifications as an expert, and it goes to his credibility as an expert.

There was then some discussion about questioning Dr. Grigson about the study rather than using a transcript. The attorney then indicated that the transcripts, where Dr. Grigson indicated that there were no other studies other than the Zimmerman Study, were after the date of the letter and report. The trial court then indicated that it was conducting an examination out of the presence of the jury pursuant to Tex.R.Crim. Evid. 705 regarding the disclosure of facts or data underlying an expert's opinion.

During the voir dire examination, Dr. Grigson admitted that he had testified in a specified Lubbock County trial that the only study that he was aware of that was conducted on his predictions was by Judge Zimmerman of

Dallas County, and that it had shown him to be 100% accurate in the only two cases that he had predicted in Judge Zimmerman's court. When confronted with the previously-described letter and report from the Dallas County District Attorney's Office, Dr. Grigson indicated that it was not a study, but rather was simply a follow-up on where some of the defendants were. He indicated that he had been aware of the letter and report when he had testified in the Lubbock County trial, but that he had not considered it a study, and that his testimony that the Zimmerman Study was the only study that he was aware of had been correct.

After the voir dire questioning, the trial court indicated that there had apparently been some misunderstanding about the purpose of the hearing with respect to the Rule 705 examination. One of appellant's attorneys then stated, "I'm not going to question Dr. Grigson's ability to render an opinion." When asked by the trial court what his position was, he said:

> Well, I don't think at this point in time since he's admitted under oath receiving this letter, and, you know, he differs that it was a study or upon how it was obtained. But I mean, the earlier reason that we were not ready was that we wanted time to find—to get the transcripts in case he had a different story on the stand. Since he's admitted it, I suppose we're prepared to go forward. We are planning on using this in an attempt to impeach him, though.

After overruling the State's objection that the letter and report was stolen from Dr. Grigson's office, the trial court sustained the State's "object[ion] to him going into any type of impeachment on collateral matters." After indicating that he wanted to finish, and the trial court expressed some confusion as to "[w]hat [he] [was] trying to finish[,]" appellant stated, "Well, that's all [and] [w]e're ready, Your Honor." Before the jury was returned, appellant indicated that the letter and report was their offer of proof which he

would have gone into in front of the jury, but that the trial court had granted the State's objection to such.

As the above discussion indicates, it appears that the primary purpose of questioning Dr. Grigson about the letter and report was to show that he had testified falsely in a previous Lubbock County trial when he had stated that the Zimmerman Study was the only study that he was aware of regarding the accuracy of his predictions. While some questioning and discussion indicate that the letter and report could have been proffered intending to show the inaccuracy of Dr. Grigson's predictions, i.e. "to show that he's been wrong, that he's made mistakes," appellant did not clearly articulate such desire. As stated above, clearly the focus was upon Dr. Grigson's previous testimony regarding his awareness of studies as to the accuracy of his predictions.

 In light of the of above-detailed proffer and discussions, we conclude that appellant did not sufficiently present to the trial court the claim that he now makes on appeal, i.e. that he wanted to impeach Dr. Grigson with the letter and report to show that some of his prior future dangerousness predictions had turned out to be incorrect. Thus, the trial court was only called upon to rule on the proposed impeachment as to Dr. Grigson's previous testimony regarding his awareness of studies as to the accuracy of his predictions, and therefore never had the opportunity to rule upon appellant's appellate rationale that he wanted to impeach Dr. Grigson with the letter and report to show that some of his prior future dangerousness predictions had turned out to be incorrect. As appellant did not sufficiently clearly expressly offer the evidence for the purpose which he now claims on appeal, such is not a basis for complaint on appeal. Tex.R.Crim.Evid. 105(b). Accordingly, point of error number one is overruled.[10]

---

**10.** In a supplemental brief, appellant also claims that the letter and report was admissible pursuant to Tex.R.Crim.Evid. 705(a) as disclosure of the expert's underlying facts or data. However clearly the letter and report was not in any way used to form the expert opinion which Dr. Grig-

son testified to in the instant cause. He also claims that it was admissible "under the state of mind exception" but does not sufficiently argue or brief that contention. Tex.R.App.Pro. 74(f) and 210(b).

Point two avers error in the trial court's refusal to allow appellant "to confront Dr. Grigson with six false sworn prior inconsistent statements that he made about the number of capital murderers he had examined who were not dangerous in his opinion." He insists that "the trial court erroneously shielded Dr. Grigson from cross-examination about a series of false sworn prior inconsistent statements."

On direct examination by the State, Dr. Grigson testified that he had "examined over 12,000 individuals that had criminal charges against them during the past 25 years." He indicated that those involved capital and non-capital cases. On cross-examination, he testified that he believed that he had examined 388 defendants in capital murder cases. Of those he said that "[t]here was 178 that [he] said was [sic] not dangerous." He then indicated that he had testified in 136 capital cases, four or five of which he was called by the defense.

Outside the presence of the jury, appellant questioned Dr. Grigson about his testimony in previous capital murder trials. Appellant pointed to discrepancies in that prior testimony as to the number of capital murder defendants whom he had examined. When it was observed that he had previously testified that the number was 391, Dr. Grigson then said that the total must now be close to 400 rather than the 388 that he had testified to earlier in the instant cause. He agreed that there was a conflict, but regarding the earlier testimony, he said, "It was just the number 388 came to my mind[,]" and "That number came to my mind, 388." On another case, when it was pointed out that he had testified that he had examined about one-hundred seventy-odd individuals charged with capital murder, Dr. Grigson admitted that such was in error, in that the number would have been over 300. In another case, Dr. Grigson admitted that his testimony there that he had examined 156 capital murder defendants was

incorrect, but rather had to have been in the three-hundreds. In three other cases, Dr. Grigson admitted that his testimony regarding the number of capital murder defendants whom he had examined had been too low. He also agreed that his testimony as to the number of those defendants whom he had found not to be a continuing threat/future danger had likewise been too low. He indicated that he could not go back and change what he had said, and had given "the best answer that [he] could at that time, but [he] thought it would be correct."

Appellant offered such evidence to be presented before the jury. He suggested that "these numbers are all over the board," and that "the jury ought to be able to see these numbers and hear his explanation for it" because "[i]t goes right to his credibility." He offered them as prior inconsistent statements. The trial court denied appellant's request.

■ As discussed above, outside the presence of the jury Dr. Grigson admitted that his prior testimony in previous capital murder trials regarding the number of examinations which he had conducted was incorrect and inconsistent with his testimony in the instant cause. Tex.R.Crim.Evid. 612(a) provides for examination of a witness concerning a prior inconsistent statement, whether oral or written. Also, as Dr. Grigson's prior admittedly inconsistent testimony had been made under oath in previous judicial proceedings, pursuant to Tex.R.Crim. Evid. 801(e)(1)(A) such were not excludable as hearsay. Rule 612(a) contains provisions for further cross-examination concerning and extrinsic evidence of such a prior inconsistent statement; however, the trial court in the instant cause prohibited in the first instance any questioning or cross-examination thereon.[11] In light of Rule 612(a), appellant was entitled to cross-examine Dr. Grigson regarding the prior inconsistent statements.[12]

---

11. Tex.R.Crim.Evid. 612(a) also states, "If the witness unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted." Thus, whether one can use extrinsic evidence is contingent upon the witness's response when confronted with the alleged inconsistent statement.

12. The State mentions the impropriety of admitting extrinsic evidence to impeach a witness's testimony about a collateral matter. As noted in *Ramirez v. State*, 802 S.W.2d 674, 675 (Tex.Cr. App.1990), "[t]he general rule is that a party is not entitled to impeach a witness on a collateral matter[,]" with the test as to whether the matter

Thus, the trial court erred in denying such cross-examination. In light of such error, we must conduct a harm analysis pursuant to *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).[13] *Shelby v. State,* 819 S.W.2d 544 (Tex.Cr.App.1991).

We must, after assuming that the damaging potential of the cross-examination was fully realized, determine whether the error of denying the cross-examination was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438, 89 L.Ed.2d at 686. Whether such an error is harmless depends upon the following factors:

1) The importance of the witness's testimony in the prosecution's case;

2) Whether the testimony was cumulative;

3) The presence or absence of evidence corroborating or contradicting the testimony of the witness on material points;

4) The extent of cross-examination otherwise permitted; and,

5) The overall strength of the prosecution's case.

*Id.; Shelby v. State,* 819 S.W.2d at 547. We shall make such a determination considering the above-detailed factors.

1) The testimony of Dr. Grigson was of some importance to the prosecution's case, in that it dealt directly with the jury's answer to Special Issue Number Two regarding the probability of appellant committing criminal acts of violence that would constitute a continuing threat to society. However, the State presented numerous other witnesses whose testimony also went to that issue.

Also, the State only twice made mention of Dr. Grigson during its jury arguments, and that was in favorably comparing one of Appellant's experts with the State's experts.

2) Dr. Grigson's testimony was to a certain extent cumulative. As noted above, the State presented numerous other witnesses whose testimony went to Special Issue Number Two. Among those other witnesses was another psychiatrist, who testified immediately prior to Dr. Grigson. That other psychiatrist's testimony included, in response to a rather lengthy hypothetical question, the opinion that appellant "will continue to commit acts of violence in the community[,]" i.e. "anywhere he is." He indicated that somebody who would commit a capital murder was going to be a threat to society in the future. He also indicated that sexual offenders are recidivist oriented. He added that "[s]ociety would never be safe from this individual [in the hypothetical]." Dr. Grigson likewise, in response to a similar hypothetical question, opined that appellant absolutely most certainly represented a continuing threat to society. Dr. Grigson also likewise opined that sex offenders are the most recidivist oriented criminals. Thus, Dr. Grigson's testimony was for the most part quite cumulative.

The State also later presented testimony in rebuttal from another psychiatrist. That psychiatrist testified that one could make predictions based upon a person's history and patterns in life. He also thought that it was ethical for a psychiatrist to render an opinion on such a prediction. However, he

is collateral being whether the cross-examining party would be entitled to prove it as part of his case tending to establish his plea. However, as noted by Judge Miller's concurring opinion, this collateral matter rule was created years prior to the adoption of the Rules of Criminal Evidence. *Id.* at 677 (Miller, J., concurring). Because the parties do not directly address the question of the continued viability of such in light of the Rules, but rather only focus upon the propriety of using extrinsic evidence to impeach, we express no opinion as to such continued viability. The State, in a supplemental response brief, does indeed more directly attack the continued viability issue; however appellant's supplemental brief does not address the issue nor respond to it in a supplemental response to the State's supplemental response. In light of such, and our conclu-

sion, *infra,* with respect to harmlessness, we decline to discuss the continued viability issue.

13. While appellant does not specifically cite the Confrontation Clause of the Sixth Amendment to the United States Constitution, his point of error does complain about being refused permission to "confront" Dr. Grigson with the prior inconsistent statements. He also argues that said prior statements were admissible under "the federal constitution to show that he was biased." At trial he likewise proffered the evidence to attack the witness's credibility. Thus the trial court's denial of the cross-examination, i.e. the constitutionally protected right of confrontation, is governed by the dictates of *Van Arsdall, supra.*

did indicate that it "would be a very unusual case where you would be absolutely certain." He indicated that he generally did not reach a level of absolute certainty and was not aware of the degree of certainty which Dr. Grigson testified to.

3) As noted above, the State presented another psychiatrist who corroborated the testimony of Dr. Grigson regarding the material issue, i.e. Special Issue Number Two. Appellant presented testimony from a psychiatrist and two psychologists. One of those psychologists questioned the accuracy and reliability of predictions about future propensity for violence and dangerous behavior and the ability to offer a professional opinion with any scientific certainty whether someone is likely to commit violent acts in the future. He testified that studies indicate that long-term predictions of violent behavior are inaccurate and "wrong two out of three times on the average[,]" thus in predicting dangerousness in any situation, it "would be more accurate if you flipped a coin." He specifically opined that Dr. Grigson's testimony via hypothetical question was not based on any scientific approach. He added that in his view, such was unethical behavior when a professional offers an opinion about something that the data just does not stand behind.

The other psychologist, who had formerly been the chief psychologist for the Texas Department of Corrections, indicated that the prediction by a psychiatrist/psychologist on a hypothetical question that somebody is going to be dangerous was not accurate. He indicated that statistical predictions could be done, i.e. that certain groups were more likely to behave violently, but that such was not done on an individual because nobody could tell who within the group would actually do it. He also stated that "[t]wo-thirds of the time clinical predictions do not prove to be true."

The psychiatrist also questioned the ability to predict future dangerousness. He stated that violence tends to be over-predicted in that there was a tendency to say that people are going to be dangerous when there is not a great deal of data to say that such is true. He cited a particular study which showed that only about one out of three of the predictions about a person being dangerous in the future were correct, but that about 90% of the predictions of nondangerousness were correct.

Thus appellant presented evidence contradicting Dr. Grigson's expert opinion. As noted above, the State presented additional expert testimony corroborating Dr. Grigson's testimony.

4) The record reflects that appellant was otherwise permitted to fully cross-examine Dr. Grigson. In particular, appellant was allowed to question regarding the number of capital murder defendants he had examined, how many he had said were dangerous/not dangerous, and how many capital cases he had testified in. However, when asked whether he had ever made a misdiagnosis, the State's objection thereto was sustained.

5) The prosecution's case with respect to the second special issue, which was the primary subject of Dr. Grigson's testimony, must be regarded as fairly strong. As noted previously, the State presented additional expert testimony and numerous lay witnesses. Those lay witnesses detailed a number of appellant's violent confrontations with various people, including several occurring in jail after being arrested for the instant offense, an incident in which he choked and attempted to sexually assault his approximately 22–year–old first cousin, and an incident in which he grabbed a 64–year–old co-worker by the throat.

We conclude, after analyzing the above five factors, that the error in denying the particular cross-examination of Dr. Grigson was harmless beyond a reasonable doubt. Accordingly, point number two is hereby overruled.

### ii. Challenge to Dr. Griffith

Point fifty-eight avers error in allowing Dr. Griffith, a psychiatrist, to testify over objection as an expert in predicting future dangerousness. Appellant insists the record is inadequate to show that Dr. Griffith had any specialized knowledge of the subject of future dangerousness, and that his experience in examining persons accused of crimes "could

have covered anything from backaches to common colds." He avers that even if those examinations were psychiatric, such "only meant that he had specialized knowledge of the mental illnesses and disorders that afflict person[s] charged with crimes" but "did not equip him to predict whether convicted criminals will continually commit violent crimes." Appellant cites *Holloway v. State*, 613 S.W.2d 497 (Tex.Cr.App.1981) for the proposition that Dr. Griffith's qualifications were inadequately shown.

As we reaffirmed in *Joiner v. State*, 825 S.W.2d 701, 708 (Tex.Cr.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 3044, 125 L.Ed.2d 729 (1993), psychiatric testimony during the punishment phase of a capital case is admissible, and the burden lies with the proponent of such testimony to show that it will assist the fact-finder and that the witness possesses the requisite expertise required by Tex.R.Crim.Evid. 702. The admission of such testimony is within the trial court's discretion and its decision regarding such will not be set aside absent an abuse of that discretion. *Id.* The special knowledge which qualifies a witness to give an expert opinion may be derived from the study of technical works, specialized education, practical experience, or a combination thereof; and such should indicate to the trial court that the witness possesses knowledge which will assist the jury in making inferences regarding fact issues more effectively than the jury could do so unaided by such opinion. *Holloway v. State*, 613 S.W.2d at 501.

As noted above, appellant attacks Dr. Griffith's qualifications as an expert.[14] The record reflects Dr. Griffith's educational background, including the subspecialty of forensic psychiatry, teaching experience, and long-term private practice. This included examining over 8,000 people charged with criminal offenses and testifying in approximately 97 capital murder trials in Texas and other states. In light of such background, we hold that the record does not reveal any abuse of

discretion in allowing the expert testimony. *See*, e.g., *Joiner, supra*, *Nethery v. State*, 692 S.W.2d 686, 709 (Tex.Cr.App.1985), *cert. denied*, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986). Point of error number fifty-eight is therefore overruled.

### B. Special Issues

Point fifty-nine claims that the second special issue was unconstitutional as applied in this case because the jury charge "did not define the vague term of art 'continuing threat to society.'" Point sixty makes the same claim because the jury charge likewise did not define "probability." However, it is well-settled that the trial court need not define these terms in the jury charge, and the failure to do so poses no constitutional problems. *Cantu v. State*, 842 S.W.2d 667, 691 (Tex.Cr.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993); *Caldwell v. State*, 818 S.W.2d 790, 797–798 (Tex.Cr.App.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1684, 118 L.Ed.2d 399 (1992). Points fifty-nine and sixty are therefore overruled.

### C. Sealed Evidence

In point number sixty-two, appellant claims that his "absolute right to a complete record for his appeal was violated when this Court refused to unseal his bill of exception about the evidence of the victim's immoral character that he wanted to present to rebut her mother's testimony about her good character." Appellant refers to cases involving omissions from the record. However, he notes that this record does indeed include a transcription of his bill of exception and that he was allowed to make such bill. His complaint goes to the trial court sealing that transcription.

The record reflects that at guilt/innocence, appellant sought to cross-examine a witness about the decedent's behavior and character. He asserted that the State's presentation of

---

14. We reject appellant's insistence that Dr. Griffith's testimony before the jury cannot be used to determine his qualifications. *See*, e.g., *Jones v. State*, 641 S.W.2d 545, 551 (Tex.Cr.App.1982) and *Gholson v. State*, 542 S.W.2d 395, 402 (Tex.Cr.App.1976), *cert. denied*, 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977), where error in not even allowing a defendant to voir dire a character witness outside the presence of the jury prior to testifying is not reversible where the record does not show that the witness was not qualified to testify.

testimony from her mother about her good moral character, support in the family, how far she had gone to school, employment, etc ... had opened the door. The State objected, and the trial court conducted an in camera hearing on the issue. At that hearing, a transcription of which is included in this appellate record, appellant was allowed to examine four witnesses to show what he intended to proffer before the jury. At the conclusion of the in camera hearing, the trial court ruled that the proffered evidence was not admissible and that the State had not opened the door to that type of evidence. The trial court also stated, "The record of this in camera hearing is ordered sealed for purposes of appeal should there be an appeal." The record does not reflect any objection or comment thereafter by appellant.

Though this proffered evidence was excluded at guilt/innocence, appellant claims that such would have been beneficial at punishment because "jurors could have found that [he] posed a greater threat to society, if they believed that he murdered a particularly valuable member of the community[.]" He adds that "[t]he jury might have placed less value on the victim's life" had it known of the excluded character/behavior evidence. He acknowledges that "[s]ome may be offended by this logic[.]" We have reviewed the transcription of the hearing; and suffice it to say that we disagree with such so-called "logic" in suggesting that the decedent's behavior indicated that she was not a particularly valuable member of the community and that her life might have had more value had she been of a different character.

Appellant's point of error does not challenge the trial court's ruling on the merits regarding the admissibility of the evidence, but rather simply complains about the trial court's decision to seal it in the record. As noted above, appellant did not make an objection to that sealing. Without a timely specific contemporaneous objection, he has waived error, if any, in such sealing. Tex. R.App.Pro. 52(a). Point sixty-two is therefore overruled.

#### D. *Penry* Claims

Point sixty-one avers error in allowing the State to cross-examine a defense expert and label mitigating evidence of child abuse against appellant as an aggravating circumstance. Appellant insists that allowing the prosecutor through cross-examination of a defense expert to suggest that child abuse is probative of future dangerousness "violated the Eighth Amendment because it converted the most important mitigating circumstance that appellant proffered as a basis for mercy into an aggravating factor."

The record reflects that the witness-in-question, the second psychologist whom appellant presented, testified about Intermittent Explosive Disorder and that the most dangerous inmates were those with chronic anger. On cross-examination, the State elicited, over objection, that a childhood environment involving beatings and alcoholism in the family had to be factored in as part of the roots/foundation cornerstones/building blocks of Chronic Anger Syndrome. Appellant had previously presented testimony from his mother and an older sister describing his upbringing and homelife as violent, receiving verbal abuse and beatings from his alcoholic father who was also violent and abusive toward his mother and siblings.

Appellant, citing *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), claims, "Evidence of child abuse is mitigating as a matter of law." Because such evidence was definitely mitigating, he insists that the trial court reversibly erred in allowing the State to portray it as aggravating.

Based upon our understanding of *Penry* and the United States Supreme Court's capital punishment jurisprudence, we cannot conclude that appellant's evidence was mandatorily "mitigating." Rather than mandating that certain evidence be considered mitigating, the sentencer must simply be allowed to fully consider and give effect to the evidence.[15] *Penry v. Lynaugh*, 492 U.S. at

---

15. In fact, the Court in *Penry* noted that that defendant's evidence of childhood abuse "indicates that there is a probability that he will be dangerous in the future." *Penry v. Lynaugh*, 492 U.S. at 324, 109 S.Ct. at 2949, 106 L.Ed.2d at 281.

328, 109 S.Ct. at 2951, 106 L.Ed.2d at 284; *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Since appellant in this point of error makes no claim that the jury was not allowed to do so, point sixty-one is hereby overruled.

Point fifty-four does claim that the trial court refused to provide an adequate vehicle for the jury to give effect to the mitigating evidence per the requisites of *Penry.* Appellant claims that the jury was unable to consider and give mitigating effect to his evidence "of severe physical and psychological abuse that he suffered at the hands of his alcoholic father when he was a young boy." As noted above appellant presented testimony from his mother and an older sister describing his upbringing and homelife as violent, receiving verbal abuse and beatings from his alcoholic father who was also violent and abusive toward his mother and siblings. This testimony indicated that the physical "abuse" against appellant primarily involved whippings with an open hand and belt, and making appellant duck-walk as punishment.

At trial, appellant made several objections to the jury charge, including that it deprived him of an individualized determination of the appropriate penalty and failed to properly include an adequate vehicle by which the jury could express the presence of adequate mitigating circumstances sufficient to justify the imposition of a life sentence.

■■■ The trial court did include, in addition to the special issues provided by Article 37.071(b)(1), (2), V.A.C.C.P., a definition of the term "deliberately," and the following instruction:

When you deliberate about the questions posed in the Special Issues, you must consider any mitigating circumstances raised by the evidence present in both phases of the trial. You are instructed that any evidence which, in your opinion, mitigates against the imposition of the death penalty, may cause you to have a reasonable doubt as to whether or not the death penalty should be imposed in this case. Even if you find and believe beyond a reasonable doubt that the conduct of the defendant which caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased, [the named decedent], would result; and even if you find and believe beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; if you have a reasonable doubt based upon the mitigating evidence that has been presented in this case as to whether the death penalty should be imposed in this case, then you will answer the Special Issues propounded to you herein "No."

As noted above Appellant objected to the jury charge, and specifically challenged the instruction as, among other things, limiting the jury's discretion to consider mitigating aspects of his character and record and the circumstances of the crime that have no relationship to the special issues, limiting the jury's discretion and not allowing application of proffered mitigating circumstances that had little or no relationship to the special issues, creating aggravating factors out of certain aspects of his mitigating evidence, and making a death sentence mandatory under certain conditions. The trial court overruled the objections and submitted the above-quoted instruction.

In *Fuller v. State,* 829 S.W.2d 191, 209 (Tex.Cr.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993), we held that a similar instruction which directed the jury to consider mitigating circumstances and to answer at least one of the special issues "no" if it determined that a life rather than death sentence was appropriate "was adequate to avoid the constitutional infirmity condemned by *Penry* " in the face of evidence that that defendant as a young child had been physically abused by his stepfather. We likewise hold that in the instant cause the above-quoted instruction was adequate and that all of appellant's mitigating evidence could be given full consideration and effect through the special issues which were submitted at trial. Accordingly, we overrule point number fifty-four.

Having reviewed all of appellant's points of error, we affirm the trial court's judgment and sentence.

McCORMICK, P.J., and MILLER, J., concur in the result.

BAIRD, J., not participating.

CLINTON, Judge, concurring.

In his first point of error appellant alleges the trial court erred to sustain the State's objection to "impeachment on collateral matters." On appeal appellant claims the trial court should have allowed him to admit the letter and accompanying report in an attempt to show that some of Dr. Grigson's prior predictions as to the likelihood that a capital defendant would constitute a future danger had proven erroneous. But at trial it is apparent appellant had a somewhat different purpose in mind. Because under the peculiar circumstances here it was within the trial court's discretion to exclude the letter and report as an attempt to impeach on a collateral matter, I concur in the result.

Before Grigson testified in front of the jury, the trial court allowed appellant to question him on voir dire. It was the trial court's express understanding that the object of this voir dire was to examine the basis of Grigson's expert opinion, pursuant to Tex. R.Cr.Evid., Rule 705(b) & (c). Appellant began by eliciting an admission from Grigson that he had previously testified in another capital murder trial in Lubbock County, in February of 1990. During that trial, on cross-examination, Grigson had testified that the only study he was aware of that had ever examined the accuracy of his predictions of future dangerousness was one that had been conducted by James Zimmerman, a district court judge in Dallas County. This study was limited to the accuracy of such predictions made in Zimmerman's own court. Appellant proffered the letter and report, addressed to Grigson and dated July 29, 1988, in a clear attempt to show that Grigson was aware as early as 1988 that another study of the accuracy of his predictions had been done, and that therefore his testimony in February of 1990 that he was not at that time aware of any other study had been a conscious distortion or lie. At the conclusion of the voir dire, appellant informed the trial court he had no intention of challenging Grigson's expertise, or the basis of his opinion, under Rule 705(c). He indicated that instead he intended to impeach Grigson in the manner developed during the voir dire.

But the particular way he proposed to impeach Grigson during voir dire fits the classic definition of impeachment on a collateral matter. See Goode, Wellborn & Sharlot, 33 Texas Practice: Texas Rules of Criminal Evidence: Civil and Criminal § 607.3, at 557–562 (2d ed. 1993). Had appellant clearly asserted *at trial* that he intended to use the letter and report to launch a general attack upon Grigson's ability to make accurate predictions about future dangerousness, as he now claims on appeal, we might well appropriately hold he should have been allowed to do so—assuming, of course, that the State did not subsequently make a hearsay objection. See *Id.*, § 607.4, at 562–65. However, it is not at all clear that this was his intention, and we cannot hold that the trial court erred to sustain the State's objection that the particular use to which appellant apparently intended to put the letter and report—to show Grigson lied on a prior occasion—amounted to impeachment on a collateral matter. It was within the trial court's discretion to exclude this evidence under Tex. R.Cr.Evid., Rule 403, as being, *inter alia*, too confusing or time consuming to justify admission. *Goode, et al.*, supra, at 560–61.

Accordingly, I concur in the judgment of the Court.