Death Opinion




 


 







IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 74,295





 

LINDA CARTY, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM HARRIS COUNTY






 Price, J., delivered the opinion for a unanimous Court.


O P I N I O N




 The appellant was convicted in February 2002 of capital murder. (1) Pursuant to the
jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article
37.071, §§ 2(b) and 2(e), (2) the trial judge sentenced the appellant to death. (3) Direct appeal to
this Court is automatic. (4) The appellant raises eleven points of error. We shall affirm.

 In points of error one and two, the appellant claims the evidence of her guilt is
legally and factually insufficient because it rests exclusively on uncorroborated
accomplice-witness testimony. She would have us apply legal and factual sufficiency
standards to our review of the accomplice-witness testimony under Article 38.14. The
appellant's argument confuses a review of evidence under the accomplice-witness rule as
set out in Article 38.14 with legal and factual sufficiency reviews. (5) We will review the
evidence under the standard appropriate to Article 38.14.

 Article 38.14 provides, "A conviction cannot be had upon the testimony of an
accomplice unless corroborated by other evidence tending to connect the defendant with
the offense committed; and the corroboration is not sufficient if it merely shows the
commission of the offense." Under this rule, the reviewing court eliminates all of the
accomplice testimony from consideration and examines the remaining portions of the
record to see if there is any evidence that tends to connect the accused with the
commission of the crime. (6) The corroborating evidence need not be sufficient by itself to
establish guilt; there simply needs to be other evidence tending to connect the defendant to
the offense. (7) We have noted that "unlike extrajudicial confessions, testimony of an
accomplice need be corroborated only as to facts 'tending to connect the defendant with
the offense committed[,]' and not as to the corpus delicti itself." (8) And "[t]he
non-accomplice evidence does not have to directly link the appellant to the crime, nor does
it alone have to establish his guilt beyond a reasonable doubt . . . . [T]here must simply be
some non-accomplice evidence which tends to connect appellant to the commission of the
offense alleged in the indictment." (9)

 The appellant claims that Chris Robinson, Josie Anderson, Marvin "Junebug" Caston,
and Zebediah Combs were accomplices as a matter of law. (10) We will assume, without
deciding, that the appellant is correct. Even if we set aside the testimony provided by these
witnesses, the evidence sufficiently tends to connect the appellant to the offense to satisfy
the requirements of Article 38.14. The following is a summary of the non-accomplice-witness testimony.

 The victim, Joana Rodriguez; her husband, Raymundo Cabrera; and Cabrera's cousin,
Rigoberto Cardenas lived in apartment 36 at Sandy Glen Apartments in Houston. The
victim's and Cabrera's son, Ray, was born on May 12, 2001. The victim and the baby came
home from the hospital the following day. At about 1:00 a.m. on May 16, 2001, four men
kicked in the victim's and Cabrera's front door, demanded marijuana and money, ransacked
their apartment, and tied up Cabrera and Cardenas. The intruders took about $800 in cash
and left with the victim and the baby. Before leaving, one of the men answered his cell
phone and said, "We are inside here. Do you want it?" Then he yelled that "she" was
outside and that they had to go. After they left, Cardenas managed to free himself and untie
Carbrera. They called 911.

 Police were dispatched to the scene at about 1:15 a.m. In the following hours,
another tenant in the complex, Florence Meyers, told police about an encounter with the
appellant that seemed suspicious. The appellant lived in apartment 38, and Meyers lived in
apartment 40. On the evening of May 15, 2001, Meyers saw the appellant sitting in a car in
the parking lot of the apartment complex. Meyers identified the car as the same one that
was later identified as the Pontiac Sunfire rented in the appellant's daughter's name. The
appellant invited Meyers to sit and visit with her. The appellant told Meyers that she was
pregnant and that the baby was going to be born the next day. There was an infant's car seat
in the back seat. Meyers testified that the appellant did not appear to be pregnant.

 Based on their conversation with Meyers, police contacted the appellant on her cell
phone and asked her to meet them at the apartment complex. She told police she was
driving her "daughter's brown car" and that it would take about 30 minutes to reach the
apartments. The appellant arrived in another vehicle driven by a friend of her husband. The
appellant agreed to accompany the police to the station. There, the appellant gave a
statement and told police that she had loaned her rental car and her daughter's car to some
people she believed might be involved in the instant offense. After the appellant was placed
under arrest, she directed officers to a house at 6042 Van Zandt Street. A black Chevrolet
Cavalier belonging to the appellant's daughter, Jovelle Carty, and a tan or gold Pontiac
Sunfire rented in Jovelle's name were both parked at the house. The victim's baby was
found alive in the Cavalier. The victim's body was found in the trunk of the Sunfire. Her
arms and legs were bound with duct tape, her mouth and nose were also taped, and she had a
plastic bag over her head which appeared to be taped around the bottom. The cause of death
was determined to be homicidal suffocation. The appellant's fingerprints were found in
both cars. Inside the cars, the officers found duct tape, nylon rope, Lysol spray, baby
clothes, baby blankets, a diaper bag containing infant formula, and other baby paraphernalia. 
The diaper bag also contained a live round of ammunition of the type and size that could be
fired from a .38 caliber gun. A .38 caliber gun was found by police in a drawer inside the
house at 6042 Van Zandt Street.

 The appellant's husband, Jose Corona, testified that in the two-and-a-half to three
years that he and the appellant had lived together, the appellant had told him three times that
she was expecting a baby. In the first two instances, she eventually told him that she had
miscarried. The appellant did not allow Corona to go with her to any prenatal doctor visits
and Corona believed the appellant had lied about the pregnancies. At the beginning of May
2001, Corona decided to leave the appellant. When he told her he was leaving, the appellant
told him she was pregnant again. Corona did not believe her and moved out. The appellant
continued to call Corona repeatedly throughout the month of May. She called him on May
15, and told him she was going to have a baby boy the next day. On May 16, she called and
told him she was going to have the baby that day. When Corona saw the appellant later that
day at the police station, he asked her if the baby had been born already and she told him
"not yet." Corona found out later that the appellant had never been pregnant. During the
early part of May 2001, Corona saw the appellant in the possession of a gun that he
identified as similar in appearance to the .38 caliber gun officers found at the house on Van
Zandt.

 After Corona moved out in early May, the appellant began moving her things to a
storage unit because the apartment lease was to terminate at the end of the month. 

Sherry Bancroft, an employee at Public Storage, testified that the appellant had an existing
storage unit in their facility and rented a second one on May 10. She had known the
appellant for several months and saw nothing different about her appearance on that day. On
May 12, the appellant rented a third unit, and told Bancroft that she was expecting a baby
boy who would be born that day. She told Bancroft that she was already in labor. The
appellant returned on May 15 around 6:30 p.m. and was there until at least 7:30 p.m. She
told Bancroft that she had indeed had the baby and that he was at home with his father. She
retrieved a baby blanket and two baby outfits from one of her units. Bancroft identified the
car that the appellant was driving on the evening of May 15 as the Pontiac Sunfire. Two
additional witnesses testified that they knew the appellant and that she had told them in the
days immediately before the offense that she was expecting a baby.

 The appellant's cell phone records led police to Gerald "Baby G" Anderson who
eventually gave a statement and was charged with capital murder in this case. The
appellant's cell phone records were introduced, reflecting eleven calls logged between
12:50 a.m. and 2:50 a.m. on May 16, 2001, between the appellant's phone and the cell
phone number that led police to Anderson. (11) Seven of those calls were placed between
1:09 a.m. and 1:14 a.m.

 Sarah Hernandez testified that she met the appellant when they were both serving
time in jail. The appellant asked Hernandez to write a letter for her because the appellant
did not want the letter to be in her own handwriting. The appellant wrote out what she
wanted the letter to say, and Hernandez copied it. Hernandez said the letter was supposed
to be from someone named Oscar. The letter said something about the appellant being set
up by "Chris and Zeb," who borrowed the appellant's car and put the baby in it. The letter
stated they had a grudge against the appellant because she was black and because the
appellant's brother, who was a DEA agent, had busted them. 

 The appellant's daughter, Jovelle, testified that she rented the Pontiac Sunfire at the
appellant's request to assist in moving some of the appellant's things to the storage unit. 
Jovelle also testified that in the last three years, the appellant miscarried three times and
that baby items were purchased in anticipation of these babies. Jovelle was in Florida at the
time of the offense, and the appellant had permission to drive her daughter's black Cavalier
while she was gone.

 The appellant's mother, Enid Carty, testified that the appellant did not mention to her
that she was pregnant when they talked on May 13 or on the following days, and the
appellant did not appear to be pregnant around that time. The appellant had told her the
previous January that she had had a miscarriage. Enid also testified that the appellant
arrived at her house in a taxi cab between 8:00 and 9:00 a.m. on May 16, 2001, took the
keys to Jovelle's black Chevrolet Cavalier, and drove off in the Cavalier.

 Based upon the above discussion, the following non-accomplice evidence, taken as a
whole, is sufficient to "tend to connect" the appellant to the commission of the victim's
kidnapping and murder: 

 1. The appellant lived two apartment numbers down from the victim in the
same complex.


 2. One of the accomplices answered a cell phone during the commission of
the offense and stated that "she" was outside and asked her if she wanted "it." 



 3. The appellant's cell phone records reflect seven calls made between the
appellant's phone and a phone that may have been used by accomplice
Anderson between 12:50 a.m. and 1:14 a.m on May 16, 2001. Cabrera
testified that the intruders broke in around 1 a.m., and police testified they
were dispatched to the scene around 1:15 a.m.


 4. The appellant was obsessed with having a baby and lied about being
pregnant to many people, including her daughter and husband. In the days
before the offense, the appellant told many people that she was pregnant and
that her baby was due in the next couple of days. The appellant told many
people that she expected to deliver a baby boy on the day before the
kidnapping. On the evening of May 15, 2001, about 5 hours before the
kidnapping, the appellant told the manager at her storage unit that she had
already delivered the baby and that he was at home with his father. 


 5. The appellant retrieved a baby blanket and two sets of baby clothes from
her storage unit on the evening of May 15, 2001. She was driving the Pontiac
Sunfire rental car in which the victim's body was found the next evening.


 6. Hours before the kidnapping, the appellant was sitting outside of the
apartment complex in the Pontiac Sunfire and there was an infant's car seat in
the back.


 7. The appellant arrived at her mother's house in a taxi around 8 or 9:00 a.m.
on May 16, and borrowed her daughter's black Cavalier.


 8. The appellant told police that she might have loaned cars to people
involved in the instant offense.


 9. On the evening of May 16, the appellant led police to the house where the
Cavalier and the Sunfire were located. The baby was found in the Cavalier and
the victim was found in the trunk of the Sunfire. The appellant had driven
both of these cars in the days and hours before and after the kidnapping.


 10. The appellant was seen in possession of a gun similar in appearance to
the gun found at the house on Van Zandt. Ammunition fitting such gun was
found in the diaper bag which was found in the Cavalier with the baby.


 11. The appellant asked a fellow inmate to write a letter which represented
that it had been written by someone else and stated that the appellant had been
set up.


Thus, even without the testimony of the witnesses who were potentially accomplices, the
evidence "tends to connect" the appellant to the commission of the crime. (12) Points of error
one and two are overruled.

 In points of error three and four, the appellant claims that the evidence is legally and
factually insufficient to establish that Anderson, Caston, and Combs were not accomplices. 
The appellant argues these points together with her first and second points, on the theory
that the evidence does not sufficiently "tend to connect" the appellant to the crime without
the testimony of these accomplices. Because we hold the evidence tends to connect the
appellant to the crime without relying on the testimony of any of the alleged accomplices,
points of error three and four are moot. We also note that legal and factual sufficiency
reviews are appropriate for assessing the sufficiency of the evidence to support an element
of the offense charged. (13) Whether a witness is an accomplice is not an element of the
offense. Points of error three and four are overruled. 

 In points of error five and seven, the appellant claims the trial court abridged her
right to confrontation as embodied in the Sixth Amendment to the United States
Constitution when it refused to permit defense counsel to cross-examine Robinson and
Combs, alleged accomplice-witnesses, using their prior inconsistent videotaped
statements. During the cross-examinations of Robinson and Combs the appellant sought to
play each witness's entire videotaped statement to refresh his memory and to impeach him
with inconsistencies. The trial court denied the appellant's requests to play the statements
before the jury. 

 The right to confrontation might be denied when appropriate cross-examination is
improperly limited. (14) However, a trial court maintains broad discretion to impose
reasonable limits on cross-examination "to avoid harassment, prejudice, confusion of the
issues, endangering the witness, and the injection of cumulative or collateral evidence." (15) 

 Here, the appellant was permitted to impeach Robinson and Combs with the contents
of their statements made to the police. Additionally, she was permitted to (and did) call to
the stand the officers who took the statements to question them about inconsistencies
between the witnesses' statements and their trial testimony. The appellant sought to have
the videotapes played in their entirety and did not make any effort to edit the tapes or
identify which portions of the tapes were appropriate for impeachment. It is not the
responsibility of the trial court "to sort through and edit the videotapes in order to
determine which statements might impeach the witness." (16) 

 Moreover, the appellant does not demonstrate the proper predicate was laid to
establish the impeachment value of the tapes. Under the Rules of Evidence, the use of
extrinsic evidence of a prior inconsistent statement "is contingent upon the witness's
response when confronted with the alleged inconsistent statement." (17) Under former Rule
of Criminal Evidence 612(a), which was identical to the present Rule 613(a), (18) we laid out
the predicate to the admission of the inconsistent statement:

 The proper predicate for impeachment by prior inconsistent statement
requires that the witness first be asked if he made the contradictory statement
at a certain place and time, and to a certain person. If the witness denies
making the contradictory statement, it can then be proved by the prior
inconsistent statement. If the witness admits the prior inconsistent
statement, however, the prior statement is not admissible. (19)


The rationale behind the predicate is that "[w]hen the contradictions are confessed,
evidently there is no use or purpose for the impeaching testimony; for this work [the
witness] performs upon himself." (20) 

 The appellant argues that the trial court did not permit her to lay the proper predicate
because it would not allow her to play the videotaped statements for the witnesses to
review. However, Rule 613(a) does not require that a witness be allowed to review a prior
inconsistent statement, but only that a prior inconsistent written statement be provided to
opposing counsel on request. (21) 

 Our review of the record reveals that, while the witnesses equivocated about making
some of the alleged prior inconsistent statements, they conceded and explained most of the
claimed inconsistencies. The appellant does not point to any statement by the witnesses at
trial denying a statement that was actually made on the tape. She therefore fails to show
that the videotaped statements had impeachment value or that her right to cross-examination was improperly limited by the trial court. Points of error five and seven are
overruled.

 In her ninth point of error, the appellant claims the trial court abridged her right to
confrontation as embodied in the Sixth Amendment to the United States Constitution when
it refused to permit defense counsel to cross-examine Caston, an alleged accomplice-witness, using his prior inconsistent videotaped statement. The appellant did not offer
Caston's videotaped statement for record purposes. By failing to make an offer of proof,
the appellant failed to preserve this issue for review. (22) Point of error nine is overruled.

 In points of error six, eight, and ten, the appellant claims the same violations under
the Texas Constitution that are alleged in points of error five, seven, and nine under the
United States Constitution. Because the appellant does not provide separate argument and
authority under the Texas Constitution, she has forfeited these claims. (23) Points of error
six, eight, and ten are overruled.

 In her eleventh point of error, the appellant claims her counsel was ineffective by
failing to make an offer of proof of Caston's videotaped statement. To establish a claim of
ineffective assistance of counsel, the appellant must show (1) that counsel's performance
was deficient; and (2) that the deficient performance prejudiced the appellant. (24) In proving
prejudice, the appellant must show a reasonable probability that but for counsel's errors,
the result of the proceeding would have been different. (25) Review of counsel's performance
is highly deferential and there is a strong presumption that counsel's performance fell
within the wide range of reasonable professional assistance. (26)

 During direct examination, Caston conceded that he had lied in making his
videotaped statement and agreed that he did not tell the police everything he knew because
he was afraid of going back to prison. On cross-examination, defense counsel questioned
Caston about his videotaped statement. Caston did not disagree with defense counsel's
characterizations of his responses on the videotaped statement, and gave explanations for
those that were confusing or otherwise inconsistent with his testimony. The appellant does
not point to any place in the record where Caston denied an inconsistency between his
testimony and his videotaped statement.

 As discussed previously, when a witness admits to a prior inconsistency, extrinsic
evidence of the inconsistency is not allowed. (27) In the absence of argument and authority
demonstrating that the extrinsic evidence was admissible, the appellant fails to demonstrate
that counsel's performance was deficient in failing to offer the extrinsic statement for
record purposes. In addition, the appellant fails to prove how the outcome of her appeal
would have been different had counsel preserved the issue. Point of error eleven is
overruled.

 The judgment of the trial court is affirmed.


Delivered: April 7, 2004


Do Not Publish
1. Tex. Penal Code §19.03(a). 
2. Unless otherwise indicated, all references to Articles refer to the Texas Code of
Criminal Procedure.
3. Tex. Code Crim. Proc. Art. 37.071 §2(g).
4. Tex. Code Crim. Proc. Art. 37.071 § 2(h).
5. See Cathey v. State, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999). 
6. Solomon v. State, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001).
7. Ibid.
8. Gribble v. State, 808 S.W.2d 65, 71 n.13 (1990).
9. McDuff v. State, 939 S.W.2d 607, 613 (1997) (internal citations omitted) (emphasis
supplied).
10. Specifically, the defendant claims that Robinson was an accomplice as a matter of law
and that the evidence was legally insufficient to establish that Anderson, Caston, and Combs
were not accomplices. In the alternative, the appellant claims that Anderson, Caston, and
Combs were accomplices as a matter of fact.
11. Hearsay objections precluded testimony as to the name of the person to whom the
phone was registered, but testimony suggested that the phone was used by Anderson or was at
least associated with Anderson.
12. Tex. Code Crim. Proc. Art. 38.14.
13. See Malik v. State, 953 S.W.2d 234, 239-40 (Tex. Crim. App. 1997). 
14. Carroll v. State, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996) (internal citation
omitted).
15. Lopez v. State, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000).
16. See Willover v. State, 70 S.W.3d 841, 847 (Tex. Crim. App. 2002). 
17. Clark v. State, 881 S.W.2d 682, 701 n.11 (Tex. Crim. App. 1994); Tex. R. Evid.
613(a) (stating that extrinsic evidence of an inconsistent statement is not admissible if the
witness unequivocally admits having made the statement). 
18. Current Rule of Evidence 613(a) provides in pertinent part:


 In examining a witness concerning a prior inconsistent statement made by the
witness, whether oral or written, and before further cross-examination
concerning, or extrinsic evidence of, such statement may be allowed, the
witness must be told the contents of such statement and the time and place and
the person to whom it was made, and must be afforded an opportunity to deny
such statement. If written, the writing need not be shown to the witness at that
time, but on request the same shall be shown to opposing counsel. If the witness
unequivocally admits having made such statement, extrinsic evidence of same
shall not be admitted.
19. McGary v. State, 750 S.W.2d 782, 786 (Tex. Crim. App. 1988) (internal citations
omitted) (internal quotation marks omitted).
20. Ibid. (quoting Walker v. State, 17 Tex. App. 16 (1884)).
21. Tex. R. Evid. 613(a) (providing "[i]f written, the writing need not be shown to the
witness at that time, but on request the same shall be shown to opposing counsel"). 
22. Tex. R. App. Proc. 33.1. 
23. Heitman v. State, 815 S.W.2d 681, 690 n.22 (Tex. Crim. App. 1991).
24. Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) (citing Strickland v.
Washington, 466 U.S. 668, 687 (1984)). 
25. Ibid.
26. Ibid.
27. Tex. R. Evid. 613(a).