

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00247-CR

_____

SAMMY SPARKS, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court No. 1586948D

Before Sudderth, C.J.; Birdwell and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Sammy Sparks[1] challenges his conviction for murdering Kenneth Daniels. He argues that (1) the trial court erred by allowing the State, during voir dire, to pose hypotheticals that amounted to improper commitment questions; (2) the trial court erred by excluding evidence relevant to Sparks's refutation of the State's contention that he had provoked the difficulty; and (3) there was insufficient evidence to support the trial court's submission of a jury instruction on the provoking-the-difficulty issue. Because Sparks's complaints were not preserved, not harmful, or both, we will affirm.

## I. Background

Sparks and Daniels knew one another long before the murder; they were friends who had lived in the same neighborhood and who occasionally drank together. Both were somewhat unsteady on their feet, and although Daniels was younger than Sparks—58 to Sparks's 65—Daniels walked with a cane and was a full head shorter.[2] To quote trial counsel, they were "two seemingly older men" who "[we]re not young, spry fellows." And on the day of the murder, both men had been drinking.

---

[1]The record indicates that Sparks's full legal name is Sammy Sparks Jr.

[2]Daniels's autopsy reflected that he was five feet, six inches tall and 135 pounds. There was conflicting evidence regarding Sparks's height and weight. Sparks had been logged as being "six two, 180" in prior police records, but when he was arrested for the murder, he was identified as "six three, 160."

**A.      Murder**

That evening, Sparks and Daniels separately visited a neighborhood store, and they began talking at the checkout counter. The interaction was captured on the store's surveillance cameras and parts of it were recorded on a bystander's cellphone.

The videos showed that verbal joking between the two men escalated into a spat, which became physical. After Daniels responded to a verbal insult by motioning towards Sparks's face and telling him to "watch it b****," Sparks told him to "get [his] hands out of [Sparks's] face, " threatened that Daniels was "a dead man," warned him that if he "d[id] that again [he was] gonna die now," and dared him to "try it again." When Daniels motioned towards Sparks's face twice more, Sparks hit him, and that began what a detective later described as a "slap fight back and forth." The men remained standing as they tussled. Contrary to Sparks's later claims, nothing in the videos showed Daniels throwing Sparks on the ground, knocking him to his knees, or attempting to choke him.

Meanwhile, bystanders in the convenience store, including the cashier behind the counter,[3] laughed. The cashier later explained that he had interpreted the interaction as a "joke" and "not serious."

During one pause in the "slap fight," Daniels reached in his pocket to deposit his money, and after doing so, he pointed his finger—hand empty—in Sparks's face

---

[3]The cashier owned the convenience store at the time of the murder.

again. Following another tussle and pause in the action—while Daniels's hands were out of his clothing and while Sparks was repeating that Daniels needed to "get out of [his] face"—Sparks pulled a knife out of his pocket.

When the men returned to tussling, Daniels grabbed onto Sparks's shirt with one hand and reached up to hit Sparks in the face with his other hand. Sparks responded by stabbing at Daniels's side multiple times, hitting him twice, once in the heart.

Daniels continued holding and leaning on Sparks for strength as his torso began to bleed onto the floor. When bystanders alerted Sparks to the injury, he removed Daniels's hands from his clothing, let him drop to the floor, and walked around him to the cash register. Sparks then attempted to proceed with his beer purchase, but the cashier refused and called 911.

When asked why he had stabbed Daniels, Sparks gave different reasons to different individuals. Daniels's niece later testified that Sparks told her he had stabbed Daniels because "he wouldn't buy him a beer." The cashier testified that Sparks had said he stabbed Daniels because he was "jumping [him]." And Sparks told the police that it had been self-defense.

## B. Interview and Indictment

Sparks consented to a videotaped interview with police. In that interview (which was admitted into evidence at Sparks's trial) he told the authorities that he had asked Daniels about his wife and Daniels had hit him, choked him, attempted to

4

throw him on the ground, and knocked him to his knee. He said that he had seen Daniels with a knife in the past and that he had not known what Daniels would do to him if he had forced him to the ground, so he pulled his knife to protect himself. But he acknowledged that Daniels had not pulled a knife out during the skirmish, insisting that Daniels's "chok[ing]" him and "try[ing] to throw [him] to the ground" were what necessitated the self-defense.

Although Sparks admitted that a knife could kill, he stated that his use of the knife had not been intended to be deadly, that he "never thought it would kill [Daniels]," and that he had not been trying to kill anyone. When asked if he had been sufficiently threatened to have shot Daniels if he had possessed a gun rather than a knife, Sparks scoffed and said "no," describing the confrontation as a "squabble" and saying that they were not mad at one another.

He was later indicted for murdering Daniels by "intentionally or knowingly caus[ing Daniels's] death . . . by stabbing him with a deadly weapon" or by "intentionally, with the intent to cause serious bodily injury to . . . Daniels, commit[ting] an act clearly dangerous to human life, namely, stabbing him with a deadly weapon, . . . and thereby caus[ing his] death." [Capitalization altered.] *See* Tex. Penal Code Ann. § 19.02(b)(1), (2).

5

## C. Jury Trial

At trial, Sparks argued that he had not intended to kill Daniels and that using a knife had been a reasonable exercise of self-defense. The jury trial that followed involved three events with particular bearing on Sparks's appeal.

### 1. Voir Dire Hypotheticals

First, during voir dire, the State presented a series of hypothetical scenarios to the venire. It asked, for example, whether deadly force would be reasonable if another prosecutor "pushes me, [and] I pull out a gun, and I shoot [him]." Although the State sought feedback from the venire on some of its hypothetical questions, it used others rhetorically for illustration. When Sparks objected to two of the hypotheticals as improper commitment questions, his objections were overruled. But the objected-to hypotheticals were among those used as rhetorical questions and did not elicit any recorded responses from any of the veniremen.

### 2. Exclusion of Testimony

Then, during trial, Daniels's niece testified regarding her uncle's death. The niece had driven Daniels to the convenience store on the night of the murder, and when Sparks's counsel asked about Daniels "not [being able to] go to [a different] store anymore," the State objected. Out of the jury's earshot, the State told the trial court that it anticipated the niece testifying that Daniels had been "standing out [at the other convenience store] and drinking and hanging out all the time and so the store owner told them they weren't allowed at the other store." The State challenged the

6

evidence as irrelevant (among other things), and when the trial court asked Sparks how the testimony was relevant, Sparks responded that the State had "opened the door" to the issue. The trial court disagreed, sustained the State's objection, and excluded the testimony.

### 3. Jury Charge

Finally, at the conclusion of the evidence, the parties and trial court conferred regarding the jury charge. The charge presented several theories and issues for the jury's consideration, including instructions on the offenses of murder by intentionally or knowingly killing Daniels; murder by causing Daniels's death while intentionally committing an act clearly dangerous to human life with the intent to cause Daniels serious bodily injury; and manslaughter by recklessly stabbing Daniels with a deadly weapon thereby causing his death. It also instructed the jury on the justified use of deadly self-defense and the provoking-the-difficulty doctrine as a qualification on self-defense.

Sparks objected, stating that "the Defense opposes any instructions on provocation." He repeated the objection later, telling the trial court that he was "objecting to the provocation paragraph." Neither time did Sparks elaborate on the legal basis for his objection. His objection was overruled.

7

**D.** **Verdict and Judgment**

The jury found Sparks guilty of murder. After hearing punishment evidence not relevant to this appeal, the jury assessed Sparks's punishment at 28 years' confinement, and the trial court entered judgment in accordance with the verdict.

## II. Discussion

Sparks challenges (1) the State's hypothetical questions during voir dire; (2) the exclusion of Daniels's niece's testimony; and (3) the sufficiency of the evidence to support the provoking-the-difficulty instruction.[4]

**A.** **Voir Dire Hypotheticals: No Preservation or No Harm**

Sparks first argues that the trial court erred by allowing the State to question the venire about three hypotheticals[5] that he claims amounted to improper commitment questions:

- "So William [one of the prosecutors] pushes me, I pull out a gun, and I shoot William. Again, is . . . the fact that he pushed me, would it be reasonable to use deadly force in that situation?"

- "William pulls a gun on me yesterday. I see William with no gun today, and I pull out a gun and shoot him. . . . . [D]o y'all think that's immediately necessary in self-defense?"

- "William calls me the worst names imaginable. . . . I pull out a gun and shoot William[.] . . . [W]ould this be reasonable for self-defense? What about pulling out a gun for verbal provocation? Is that sufficient? Is that okay?"

---

[4]We have reordered Sparks's issues for organizational purposes.

[5]The State posed other hypotheticals as well, but because they are not challenged on appeal, we need not recite them.

For an erroneous voir dire question to amount to reversible error, it must be preserved and harmful. *See* Tex. R. App. P. 33.1(a), 44.2(b).

Because Sparks did not object to the first of these hypotheticals, that challenge was not preserved for our review. *See* Tex. R. App. P. 33.1(a); *Halprin v. State*, 170 S.W.3d 111, 119 (Tex. Crim. App. 2005) (holding appellant failed to preserve challenge to allegedly improper commitment question when he failed to object to it).

As for the latter two hypotheticals, although Sparks preserved his challenges by unsuccessfully objecting to them, there were no recorded responses from any of the veniremen. To be harmful, the allegedly improper question must have resulted in "the defendant [being] tried by a juror that had prejudged him or some aspect of his case because the State had improperly committed one or more veniremen to a verdict or course of action before hearing any evidence." *Sanchez v. State*, 165 S.W.3d 707, 714 (Tex. Crim. App. 2005); *Salinas v. State*, No. 02-18-00060-CR, 2019 WL 1574953, at *7 (Tex. App.—Fort Worth Apr. 11, 2019, pet. ref'd) (mem. op., not designated for publication); *see* Tex. R. App. P. 44.2(b). When a question is directed at the entire venire, the harm analysis requires consideration of factors such as the number of veniremen who committed themselves, whether those veniremen served on the jury, and whether the defendant used and exhausted his preemptory challenges on the committed veniremen. *See Sanchez*, 165 S.W.3d at 714 (listing seven nonexhaustive, nonexclusive factors for consideration).

9

Here, the State used the two objected-to hypotheticals rhetorically by answering its own questions, explaining the reasoning behind its answers, and asking—again rhetorically—"[d]oes that makes sense?" or "[d]o y'all understand that?"[6] The record does not indicate that the veniremen confirmed that the hypothetical "ma[d]e sense" or that they "underst[ood]," nor does it indicate that any of the veniremen committed themselves to a particular verdict or course of action. Consequently, Sparks cannot show that the allegedly erroneous hypotheticals harmed him. *See Salinas*, 2019 WL 1574953, at *7 (holding no harm from allegedly improper commitment question and explaining that "no veniremen committed to a verdict or a course of action on the indecency charge" and the jury did not reach the lesser-included offense of indecency); *Montoya v. State*, Nos. 03-15-00125-CR, 03-15-00126-CR, 2016 WL 4527599, at *3 (Tex. App.—Austin Aug. 23, 2016, no pet.) (mem. op., not designated for publication) (noting that "[o]nly two venire members responded to the commitment question and, although the question was posed to the entire panel of

---

[6]For example, when the State posed the second listed hypothetical—asking whether it was "immediately necessary in self-defense" to shoot William the day after seeing William with a gun—it answered its own question and moved on without any recorded responses:

So in my situation we have here, when William pulled a gun on me yesterday and then today I see him with no gun and I shoot William, do y'all think that's immediately necessary in self-defense? Why not? Right? Just because it's been a day, and you didn't have a gun now? Does that make sense?

Okay. So [proceeding to the next hypothetical,] number three, . . . . .

10

potential jurors, the likelihood that the jury's verdict was substantially affected by the State's commitment questioning during voir dire is very low"); *cf. Dancer v. State*, 253 S.W.3d 368, 372–73 (Tex. App.—Fort Worth 2008, pet. ref'd) (per curiam) (mem. op.) (holding instruction to disregard alleged improper commitment question cured the error and noting that "none of the jurors responded to the allegedly improper commitment question").

We overrule this issue.

## B.     Excluded Evidence:  No Preservation and No Harm

Sparks next contends that the trial court erroneously excluded Daniels's niece's testimony regarding Daniels's banishment from another neighborhood store.  But this complaint was not preserved, and even if it had been both preserved and erroneous, the testimony's exclusion would not have been harmful.

### 1.     Standard of Review

To preserve an evidentiary complaint for appellate review, a party must make a "timely request, objection, or motion" to the trial court that "state[s] the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context."  Tex. R. App. P. 33.1(a); *see Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005) (quoting Rule 33.1(a) and describing it as "a prerequisite to presenting a complaint for appellate review").  "[T]he party complaining on appeal . . . about a trial court's admission, exclusion, or suppression of

11

evidence must, at the earliest opportunity, have done everything necessary to bring to the judge's attention the evidence rule or statute in question and its precise and proper application to the evidence in question." *Reyna*, 168 S.W.3d at 177 (quoting *Martinez v. State*, 91 S.W.3d 331, 335–36 (Tex. Crim. App. 2002)); *see Ruiz v. State*, No. 14-05-00757-CR, 2007 WL 2239289, at *3 (Tex. App.—Houston [14th Dist.] Aug. 7, 2007, pet. ref'd) (mem. op., not designated for publication) ("Failure to present a particular argument to the trial court in support of the admission of excluded evidence waives that argument for appeal."). If the party's appellate rationale for the admission of evidence differs from the one it presented to the trial court such that "the trial judge 'never had the opportunity to rule upon' th[e appellate] rationale," then the complaint has not been preserved for review. *Reyna*, 168 S.W.3d at 179 (quoting *Clark v. State*, 881 S.W.2d 682, 694 (Tex. Crim. App. 1994)); *see Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial.").

Even if an evidentiary complaint is properly preserved, though, the erroneous admission or exclusion of evidence will not result in reversal unless the error affected the defendant's substantial rights, meaning that it "had a substantial and injurious effect or influence in determining the jury's verdict." *Bosquez v. State*, 446 S.W.3d 581, 585 (Tex. App.—Fort Worth 2014, pet. ref'd) (mem. op.); *see* Tex. R. App. P. 44.2(b); *Petty v. State*, No. 02-21-00130-CR, 2022 WL 4545532, at *10 (Tex. App.—Fort Worth Sept. 29, 2022, pet. ref'd) (mem. op., not designated for publication) (recognizing that

12

"an error does not affect a substantial right if the appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect").

## 2. No Preservation

At trial, the State argued that the challenged testimony regarding Daniels's banishment from another neighborhood store "d[id]n't amount to something that [wa]s impeachable for the victim," it "d[id]n't fit the specific fact pattern," and it was "not relevant." Sparks responded that the banishment was "part of the fact pattern," that the State "already brought [it] up" that Daniels had alcohol in his system, and that the banishment "plac[ed] it into context in addition to it being relevant." But when the trial court noted that the anticipated testimony described a "bad act" and asked Sparks to explain how it was relevant, Sparks did not enunciate its relevance. There was no mention of the doctrine of provoking the difficulty or the testimony's alleged relevance to that doctrine. Rather, Sparks argued that the State had "opened the door" to the issue by asking the niece about Daniels "being a friendly individual who was walking around normally." *See Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009) ("Evidence that is otherwise inadmissible may become admissible when a party opens the door to such evidence."). The trial court rejected this as a basis for the testimony's admission, explaining that the banishment went to Daniels's "drinking and being a vagrant" as opposed to him "being violent or aggressive," so the State did

13

not open the door to it. And without Sparks enunciating any further grounds for the testimony's admission, the trial court sustained the State's objection.

Now on appeal, Sparks argues that the niece's testimony regarding Daniels's banishment was relevant because it disproved the State's theory of provoking the difficulty. But Sparks did not present this argument to the trial court as a basis for the evidence's admission.

Our sister court addressed a similar discrepancy between an appellant's trial and appellate court evidentiary arguments in *Ruiz v. State*. 2007 WL 2239289, at *4. There, the appellant attempted to offer testimony from witnesses who feared the complainant along with testimony regarding specific bad acts that had contributed to their fear. *Id.* at *2. The appellant told the trial court that such evidence was relevant to rebut the contention that she was dangerous, that it was required by "fairness," and that the State had opened the door to it. *Id.* at *4. After the trial court excluded the evidence, the appellant argued on appeal that such exclusion was erroneous in part because the testimony was necessary to support her theory of self-defense. *Id.* But "[a]t no point during the proceedings [below] did defense counsel argue that any excluded evidence was admissible as proof of any defensive theory, much less self-defense specifically." *Id.* Thus, our sister court concluded that the appellant had failed to preserve her complaint. *Id.*

Similarly here, Sparks did not tell the trial court of the evidence's alleged relevance to the provoking-the-difficulty issue, even when Sparks was directly asked

by the trial court how the excluded evidence was relevant.  Because "[a]t no point during the proceedings [below] did defense counsel argue that any excluded evidence was admissible as proof of [his] defensive theory" or the provoking-the-difficulty limitation upon it, *id.*, "the trial judge 'never had the opportunity to rule upon' th[at] rationale." *Reyna*, 168 S.W.3d at 179–80 (quoting *Clark*, 881 S.W.2d at 694).  Sparks's complaint thus was not preserved for our review.  *See id.* (holding appellant failed to preserve challenge when he argued to trial court that evidence was admissible to attack victim's credibility and argued on appeal that "the Confrontation Clause demanded admission of the evidence"); *Clark*, 881 S.W.2d at 694 (holding appellant failed to preserve challenge when he argued to trial court that evidence was admissible to impeach witness on one basis and argued on appeal that it was admissible to impeach witness on different basis); *Mejia v. State*, Nos. 09-14-00419-CR, 09-14-00420-CR, 09-14-00421-CR, 09-14-00422-CR, 2016 WL 3564408, at *1–2 (Tex. App.—Beaumont June 29, 2016, no pet.) (mem. op., not designated for publication) (holding appellant failed to preserve complaint when he asserted at trial that witness's immigration status was relevant to motive to lie but argued on appeal that exclusion of the evidence violated his constitutional rights to present a complete defense and cross-examine witnesses).

### 3. No Harm

Even if Sparks had preserved the issue, though, and even if we assume that the testimony's exclusion was erroneous, we do not see how it could have substantially influenced the jury's verdict.

Sparks claims that Daniels's niece's testimony would have shown that Sparks "could not have set up the unforeseen event of the decedent being ejected from the other store" and thus "could not have orchestrated the set of events as a ploy to kill," as Sparks claims was required to prove that he was provoking the difficulty. *See Elizondo v. State*, 487 S.W.3d 185, 197 (Tex. Crim. App. 2016) (reciting elements of provoking the difficulty including that the provocation was "for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other"). But this was not the State's theory of provoking the difficulty.

The State did not claim that Sparks knew Daniels would "be[] ejected from the other store"; it claimed that Sparks had provoked the fight after he and Daniels ran into one another at the neighborhood store. It pointed to evidence, for example, that "the first push was thrown by [Sparks]" as showing that he had allegedly provoked the difficulty. There was no dispute that Sparks was in the convenience store before Daniels arrived, and the State offered no evidence that Sparks plotted to run into Daniels at the store on the night of the murder. Given that Sparks claims the excluded testimony was relevant to a theory of provoking the difficulty different from the one the State was advancing, the record as a whole provides a fair assurance that

16

the testimony's exclusion "did not influence the jury or that it had but a slight effect." *Petty*, 2022 WL 4545532, at \*10.

Based on the absence of both preservation and harm, we overrule this issue.

### C. Provoking-the-Difficulty Instruction: No Preservation and No Harm

Finally, Sparks argues that the trial court erred by charging the jury on the doctrine of provoking the difficulty because, he contends, there was insufficient evidence to support such an instruction. Much like Sparks's evidentiary complaint, though, even if we assume that the instruction was erroneous, Sparks's objection to it was insufficiently specific to apprise the trial court of the error, and the instruction's inclusion in the charge was not egregiously harmful.

#### 1. Standard of Review and Governing Law

Provoking the difficulty is a term of art that refers to a particular qualification on the right of self-defense. *See Elizondo*, 487 S.W.3d at 197–98. Specifically, "if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other under the guise of self-defense, the defendant forfeits his right of self-defense." *Id.* at 196, 198. A jury may be charged on the doctrine only if there is some evidence for a rational jury to find, beyond a reasonable doubt, that the State has proved the doctrine's three elements:

(1) that the defendant did some act or used some words that provoked the attack on him,

(2) that such act or words were reasonably calculated to provoke the attack, and

17

(3) that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other.

*Id.* at 196–98 (indentation altered) (quoting *Smith v. State*, 965 S.W.2d 509, 513 (Tex. Crim. App. 1998)). If a jury is instructed on provoking the difficulty without evidence of its three elements, then the instruction is erroneous, and we review the error for harm. *See id.* at 197, 199, 204.

The degree of harm required for an erroneous jury instruction to warrant reversal depends on whether the defendant preserved the error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) ("The degree of harm necessary for reversal depends on whether the appellant preserved the error by objection."). To preserve an objection to a jury-charge instruction, a party must "present his objections thereto . . . distinctly specifying each ground of objection." Tex. Code Crim. Proc. Ann. art. 36.14. The objection "must be sufficiently specific to point out the errors complained of" and to "afford [the trial court] an opportunity to correct it" by identifying in "what respect the defendant regards the charge as defective." *Hernandez v. State*, No. 02-17-00353-CR, 2019 WL 490510, at *6 (Tex. App.—Fort Worth Feb. 7, 2019, pet. ref'd) (mem. op., not designated for publication) (quoting *Harkins v. State*, 268 S.W.3d 740, 746–47 (Tex. App.—Fort Worth 2008, pet. ref'd)); *see* Tex. R. App. P. 33.1(a).

If a party does not preserve error, then we review the inclusion of the erroneous instruction for egregious harm. *See Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022); *Ngo*, 175 S.W.3d at 743–44. A defendant suffers egregious harm if the erroneous jury instruction caused actual harm that "affect[ed] the very basis of the case, deprive[d] the accused of a valuable right, or vitally affect[ed] a defensive theory." *Alcoser*, 663 S.W.3d at 165; *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015); *see Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011). To determine whether a jury instruction's inclusion caused egregious harm, we consider the error in light of (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the arguments of counsel; and (4) other relevant information in the record. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *see Alcoser*, 663 S.W.3d at 165; *Arrington*, 451 S.W.3d at 840. "Egregious harm is a difficult standard to meet." *Alcoser*, 663 S.W.3d at 165.

## 2. No Preservation[7]

Sparks did not preserve his challenge to the provoking-the-difficulty instruction.

---

[7]The State does not dispute Sparks's preservation of his appellate challenge to the provoking-the-difficulty instruction. But preservation is a "systemic requirement," and whether or not it is raised by the parties, we cannot reverse a conviction without addressing the issue. *Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016).

During the charge conference, Sparks's counsel objected to the instruction with a single sentence: "Judge, I guess the only other matter before we close on this charging conference would be that the Defense opposes any instructions on provocation." Sparks did not elaborate on this objection or provide any basis for it. Later, as the charge conference was wrapping up, Sparks reiterated his objection, telling the trial court that he was "objecting to the provocation paragraph." Again, he failed to elaborate.

Sparks's objection is similar to that in *Willis v. State*, No. 03-01-00671-CR, 2002 WL 31118305, at *4 (Tex. App.—Austin Sept. 26, 2002, no pet.) (not designated for publication). There, the appellant argued on appeal that the trial court's charge had erroneously instructed the jury on an issue—the law of parties—without sufficient evidence to warrant the instruction. *Id.* But as here, the appellant had lodged a bare-bones objection to the instruction with a single sentence: "We would also object to the parties charge as it stands in paragraph 4 of the charge." *Id.* The Austin Court of Appeals held that this was insufficiently specific to preserve error. *Id.* at *4–5 (holding further that single-sentence objection to instruction on joint possession also failed to preserved error).

Although *Willis* is neither published nor binding on us, we agree with its analysis of the preservation issue. As there, Sparks's broad, unexplained objection to "any instructions on provocation" was insufficient to notify the trial court of the specific basis for his challenge. Tex. Code Crim. Proc. Ann. art. 36.14. Sparks did

20

not tell the trial court that there was insufficient evidence of provoking the difficulty, much less specify which elements of the doctrine were allegedly lacking.[8] He therefore failed to preserve his challenge. *See* Tex. R. App. P. 33.1(a).

### 3. No Egregious Harm

Because Sparks failed to preserve his challenge, even if we assume that there was insufficient evidence to support submission of the provoking-the-difficulty instruction, the instruction will not warrant reversal unless its inclusion in the charge caused egregious harm. *Lozano v. State*, 636 S.W.3d 25, 29 (Tex. Crim. App. 2021); *Hernandez*, 2019 WL 490510, at *7. It did not. While the jury charge itself suggests harm, the state of the evidence, counsels' arguments, and other factors in the record indicate that the instruction did not affect the "very basis of the defendant's case, deprive[] him of a valuable right, or vitally affect[] a defensive theory." *Lozano*, 636 S.W.3d at 29; *see Arrington*, 451 S.W.3d at 840.

### a. Jury Charge

As the State concedes, the jury charge as a whole suggests that the provoking-the-difficulty instruction was harmful.[9]

---

[8]In fact, when Sparks initially stated that he "oppose[d] any instructions on provocation," the trial court stated that it "heard on the video the injured party saying . . . a slur about his sexual behavior, Mr. Sparks's." Based on this response, the trial court appears to have understood Sparks's objection as a reference to Daniels's verbal provocation of Sparks rather than Sparks's provocation of the conflict. Either way, Sparks did not clarify during the charge conference.

Key portions of the instruction were almost identical to those used in *Reeves v. State*, where the Court of Criminal Appeals described the provoking-the-difficulty instruction as "[in]comprehensible" and found that the jury charge as a whole weighed in favor of harm. 420 S.W.3d 812, 818 (Tex. Crim. App. 2013); *see Elizondo*, 487 S.W.3d at 206–07 (denouncing similarly worded provoking-the-difficulty instruction as incomprehensible). As in *Reeves*, the two paragraphs applying the provoking-the-difficulty doctrine consisted of two run-on sentences with more than 120 words each.[10] 420 S.W.3d at 818 (noting that first application paragraph on

---

[9]In his harm analysis, Sparks complains of various other alleged deficiencies in the charge, which he claims contributed to the jury charge as a whole weighing in favor of harm. Because we agree with him that the jury charge as a whole weighs in favor of harm, we need not address all of his separate allegations. *See* Tex. R. App. P. 47.1.

[10]The application paragraphs provided:

So, in this case, if you find and believe from the evidence beyond a reasonable doubt that the Defendant, Sammy Sparks, immediately before the difficulty, then and there did some act, or used some language, or did both, as the case may be, with the intent on his, the Defendant's, part to produce the occasion for killing the deceased, Kenneth Daniels, and Defendant's part, if there were such, were reasonably calculated to, and did, provoke a difficulty, and that on such account the deceased attacked Defendant with deadly force, or reasonably appeared to Defendant to so attack him or to be attempting to so attack him, and that the Defendant then killed the said Kenneth Daniels by the use of deadly force, to-wit, by stabbing him with a knife, in pursuance of his original design, if you find there was such design, then you will find against the Defendant on the issue of self defense.

On the other hand, if you find from the evidence that the acts done or language used by the Defendant, if any, were not, under the

22

provoking the difficulty "contain[ed] 156 words in one sentence," that second paragraph "contain[ed] 125 words in one sentence," and that "[n]either [wa]s comprehensible"). And "[b]ecause these instructions were not [understandable], 'this is not a case in which the reviewing court should apply the usual presumption that the jury understood and applied the court's charge in the way it was written.'" *Id.* at 818–19 (quoting *Gelinas v. State*, 398 S.W.3d 703, 711 (Tex. Crim. App. 2013) (Cochran, J., concurring)); *see Elizondo*, 487 S.W.3d at 208 (quoting and applying *Reeves* in harm analysis of similar provoking-the-difficulty instruction).

Moreover, also like *Reeves*, the provoking-the-difficulty instruction followed the instruction on self-defense and came at the very end of the jury charge, "[s]o the last substantive instruction that the jury read was the erroneous one." *Reeves*, 420 S.W.3d at 819; *see Elizondo*, 487 S.W.3d at 208 (similar).

Although *Reeves* reviewed the comparable charge error for "some harm" rather than applying the higher egregious-harm standard applicable here, *see Reeves*, 420 S.W.3d at 816–17; *see also Elizondo*, 487 S.W.3d at 204–05 (similar), the court's sharp

---

circumstances, reasonably calculated or intended to provoke a difficulty or an attack by deceased upon the Defendant, or if you have a reasonable doubt thereof, then in such event, Defendant's right of self defense would in no way be abridged, impaired, or lessened, and if you so find, or if you have a reasonable doubt thereof, you will decide the issue of self defense in accordance with the law on that subject given in other portions of this charge, wholly disregarding and without reference to the law on the subject of provoking the difficulty.

criticism of the provoking-the-difficulty instruction leaves little doubt that, even under the higher standard, the charge as a whole weighs in favor of harm.

### b. State of the Evidence

The state of the evidence, though, indicates the improbability that the provoking-the-difficulty instruction caused actual harm that tainted the very basis of the case or vitally affected a defensive theory. *See Arrington*, 451 S.W.3d at 840 (stating standard for egregious harm).

In reviewing the state of the evidence, we must consider not only the extent to which the parties contested and presented evidence on the relevant issue but also the weight and "plausibility of the evidence raising the defense." *Lozano*, 636 S.W.3d at 29 (analyzing egregious harm due to erroneous inclusion of instructions on duty to retreat); *see Villarreal v. State*, 453 S.W.3d 429, 437 (Tex. Crim. App. 2015) (noting that court of appeals must consider "the relative [strength or] weakness of the defensive evidence in light of the entire record"). Although Sparks's purported need to act in self-defense was hotly contested, his need to use deadly force in self-defense was neither as contested nor as plausible, and that was the form of self-defense presented to the jury and woven into the provoking-the-difficulty instruction.

The State presented evidence that Sparks had intended to kill Daniels and that deadly self-defense was not warranted. To prove intent, it highlighted the portions of the video evidence showing that Sparks had stabbed Daniels multiple times, that he made no effort to help Daniels, and that he had tried to purchase a beer over

24

Daniels's dying body. To disprove Sparks's alleged need to act in deadly self-defense, the State noted how the video evidence debunked Sparks's claims that Daniels had choked him and knocked him to the ground, it emphasized the portions of the videos showing that Sparks had threatened Daniels and had thrown the first punch, it highlighted the size and strength differences between Sparks and Daniels, and it elicited testimony that Sparks and Daniels appeared to be "joking together" and "not serious" before the stabbing.

Sparks, meanwhile, contended that he had not intended to kill Daniels, that the skirmish warranted his use of self-defense generally, and that he had not intended for his use of the knife to be deadly. To show his lack of intent, Sparks highlighted evidence that he and Daniels had been friends, that he had stayed at the store after the stabbing, and that he had cooperated with the police. Sparks further elicited testimony that "not . . . everybody who gets stabbed dies" and that "the odds of being stabbed in the left [heart] ventricle are pretty low if somebody doesn't know where they're aiming." And he attempted to show that his acting in self-defense was reasonable by offering testimony that the neighborhood was a high-crime area, questioning alleged overstatements of his size, and emphasizing footage from his videotaped interview in which he told the police that Daniels was stronger than he was, that Daniels had carried a knife in the past, and that he had not known what Daniels would do to him.

25

Yet, "the issue [wa]s deadly force, not regular self-defense." *Lozano*, 636 S.W.3d at 32 (noting similarly and holding no egregious harm from erroneous instructions on duty to retreat). The only form of self-defense presented to the jury asked it to determine whether Sparks had "reasonably believ[ed] that the use of deadly force on his part was immediately necessary to protect himself against [Daniels's] attempted use of unlawful deadly force." "Deadly force," in turn, was defined as "force that [wa]s intended or known by the person using it to cause, or in the manner of its use or intended use [wa]s capable of causing, death or serious bodily injury." And the evidence that Daniels had used "deadly force" and that Sparks's "deadly" response had been reasonably necessary was weak at best.

In Sparks's police interview, he admitted that he had not seen Daniels with a knife that night, he scoffed at the idea that the "squabble" would have warranted him to shoot Daniels, and despite conceding that a knife could kill, he denied that he had intended to respond with deadly force.[11] In other words, Sparks indirectly acknowledged that Daniels had not attacked him with deadly force and that a deadly response was not necessary. Plus, the videos of the murder revealed that Daniels's hands were out of his pockets and weaponless when Sparks pulled his knife, and the

---

[11]Of course,"[t]he Penal Code does not require that a defendant intend the death of an attacker in order to be justified in using deadly force in self-defense." *Alonzo v. State*, 353 S.W.3d 778, 783 (Tex. Crim. App. 2011). But the defendant must have "reasonably believed that the force [used] was necessary to protect himself against [the ]other's unlawful use of force, and the amount of force actually used [must have been] permitted by the circumstances." *Id.*

videotaped differences in size and stability depicted Daniels as the smaller, cane-reliant party. It is extremely unlikely that the jury could have found that Sparks reasonably believed a deadly response to be necessary when Sparks himself had scoffed at the idea in the context of use of a gun.

Perhaps this is why neither party dedicated substantial time to presenting evidence regarding provoking the difficulty. As a doctrine that acts as a limitation to self-defense, it was premised on the idea that Sparks's actions provoked Daniels to "attack[] . . . with deadly force." And on this record, there is no evidence that Daniels ever attacked Sparks with deadly force.

While at trial the parties periodically referenced "provocation" in the general sense—disputing who started the argument and who was the first to become physical—apart from Sparks's threat that Daniels would die, the State did not present evidence that Sparks had hatched a plan to kill Daniels and intentionally provoked a tussle as a rouse to kill him.

Given the lack of evidence and implausibility of the idea that deadly self-defense was reasonably necessary, the provoking-the-difficulty instruction was extremely unlikely to have caused actual harm that affected the very basis of the case or a defensive theory. *See Villarreal*, 453 S.W.3d at 440 (weighing state of the evidence against egregious harm when defendant's statements "were internally inconsistent with his claim of self-defense and were contradicted by the entirety of the record").

27

### c. Arguments of Counsel

The arguments of counsel similarly weigh against egregious harm.

Sparks's opening statement did not mention the doctrine of provoking the difficulty at all. Rather, Sparks's counsel argued that the incident was not murder. And she expounded on this in her closing argument, repeatedly telling the jury that the death was "a tragedy," that Sparks "didn't mean for [Daniels] to be killed," and that even after the stabbing, Sparks "didn't think anyone would die in that store[—]that's why he[ was] standing around outside" afterward. She claimed that Sparks had considered the knife to be a means of non-deadly force, telling the jury that "most of the time, knife wounds don't kill anybody" and that "[t]his is just the way they handle stuff over there" in Sparks's neighborhood.

Sparks's counsel further emphasized that these were "old men," that Sparks "felt threatened," that Sparks knew Daniels to be "younger" and "stronger," and that he knew Daniels to carry a knife. But only one component of Spark's closing argument attempted to justify the use of deadly force, as opposed to non-deadly, force: Sparks's counsel pointed the jury to the portion of the videos in which Daniels "reach[ed] in his pocket," speculating that Sparks could have believed that Daniels was pulling a knife and could have reasonably perceived an apparent, deadly danger. As the State noted in its rebuttal argument, though, this allegation came at the very

end of the case,[12] and Sparks's own interview belied it. As already noted, Sparks told the police that he had not seen Daniels with a knife that night, he acknowledged that Daniels had not had a knife out during the skirmish, and he scoffed at the idea that a deadly response—such as shooting Daniels—had been necessary.

The State, meanwhile, used its jury arguments to reiterate its own theory of the case by arguing that Sparks had intended to kill Daniels. In its opening statement, it told the jury that it would see video footage of Sparks "say[ing] something to the effect of 'You're going to die right here in this store[,]'" followed by him "tak[ing] out a folding knife . . . [and] . . . stab[bing] this victim in the chest." And it repeated this line multiple times in its closing argument before telling the jury that, "[i]t's pretty simple[:] You stab someone in the chest after telling them they're going to die, that's murder." It urged the jury to "[t]hink about all the intentional acts that [Sparks] did"—that he "hit the victim first," that he "intentionally pulled the knife out," that he "lean[ed] in and smile[d] to the victim" after pulling the knife, and that when Daniels fell to the floor bleeding, Sparks did not call 911 or "see if [the victim] was okay" but instead "[w]alk[ed] around [the] dying body and trie[d] to get . . . a beer."

The State's closing also poked a variety of holes in Sparks's theory of self-defense. It argued that no reasonable person in Sparks's situation would have felt so threatened as to consider deadly self-defense to be necessary, it pointed out "the size

_____

[12]The State commented that "[n]ow, magically, [Sparks] has formulated this thing in closing arguments about [Daniels] reaching into his pocket."

29

difference" between Sparks and Daniels and the fact that "the victim had a cane," and it asserted that pulling out a knife was not a reasonable response to what everyone in the store thought was "kind of a joke." It also questioned whether Sparks subjectively felt threatened, highlighting the discrepancies between Sparks's statements to the police and the video footage, and reminding the jury that Sparks was "smiling" and "[l]aughing" during the tussle that preceded the stabbing.

The State also referenced the doctrine of provoking the difficulty as one of its many challenges to self-defense, commenting that "you also can't be the one provoking the situation." But it did not linger on the doctrine, dive into the elements, or draw the jury's attention to the provoking-the-difficulty instruction.

The same was true when the State mentioned provoking the difficulty in its rebuttal argument. It asked the jury "to think about the fact the first push was thrown by [Sparks]," claiming that this showed he was "provoking the difficulty." But it did not elaborate on how or why the facts allegedly satisfied the elements of the doctrine. Indeed, its arguments largely invoked the ordinary meaning of the term "provocation" rather than advancing the idea that Sparks had plotted a rouse to kill Daniels, as was required by the provoking-the-difficulty doctrine.

Because the parties' arguments did not emphasize or draw the jury's attention to the provoking-the-difficulty instruction, this factor weighs against egregious harm. *See Cosio*, 353 S.W.3d at 777 (weighing arguments of counsel against finding of egregious harm because "neither of the parties nor the trial judge added to the charge

30

errors by telling the jury that it did not have to be unanimous"); *cf. Elizondo*, 487 S.W.3d at 208–09 (concluding that, although State's argument addressed concept of provoking the difficulty, the instruction was not brought to the front of jurors' minds, so factor was neutral regarding presence of some harm); *Ngo*, 175 S.W.3d at 750–51 (holding egregious harm when "the trial judge and the prosecution misstated the law at the very beginning of the case [in voir dire] and at the very end [in the charge]").

### d. Other Record Considerations

The record contains another relevant consideration as well: self-defense was not Sparks's only defensive theory.[13] *See Elizondo*, 487 S.W.3d at 209 (considering lack of other defensive theories in fourth harm factor). Sparks's primary defensive theory was that he had not intended to kill Daniels at all. Sparks repeated this argument throughout the case, and when the State rested, Sparks moved for a directed verdict based on the alleged "fail[ure] to prove that there was intent." Self-defense was arguably a secondary defensive theory, and provoking the difficulty was merely one of the ways the State sought to shoot holes in that secondary theory.

Even for the State, though, the doctrine of provoking the difficulty was relatively far down the list of its challenges to self-defense. As already discussed, the State primarily argued that Sparks had intended to kill Daniels, that Sparks was not in fear, and that the spat did not warrant a deadly response.

---

[13]In his harm analysis, Sparks raises new voir dire and evidentiary complaints regarding statements and excluded evidence that he claims contributed to the harm.

Because self-defense and provoking the difficulty were not the only theories relied upon by the respective parties, this factor weighs against egregious harm. *Cf. id.* (weighing factor in favor of harm when self-defense was defendant's sole defensive theory and holding that some harm existed); *Villarreal*, 453 S.W.3d at 440 (concluding that "[b]ecause the [erroneously omitted instruction] affected only appellant's secondary defensive theory," it did not "touch[] upon a 'vital aspect' of his case").

### e. Summary

"Egregious harm is a difficult standard to meet," *Alcoser*, 663 S.W.3d at 165, and the record in this case shows that the provoking-the-difficulty instruction does not meet that standard. Despite the "[in]comprehensible" nature of the instruction, *Reeves*, 420 S.W.3d at 818, the state of the evidence, the arguments of counsel, and other record considerations demonstrate the improbability of any actual harm that "affect[ed] the very basis of the case, deprive[d] the accused of a valuable right, or vitally affect[ed] a defensive theory." *Alcoser*, 663 S.W.3d at 165; *see Engel v. State*, 630 S.W.3d 192, 204 (Tex. App.—Eastland 2020, no pet.) (holding no egregious harm from erroneous wording of provoking-the-difficulty instruction when state of the evidence and arguments of counsel weighed against harm).

We overrule this issue.

### III. Conclusion

Having overruled Sparks's three issues, we affirm the trial court's judgment.
Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 28, 2024

33